**In re LTV SECURITIES LITIGATION.**
**MDL–371.**

United States District Court,
N. D. Texas,
Dallas Division.

July 31, 1980.

As Amended Aug. 5, 1980.

Jules Brody, Stull, Stull & Brody, New York City, Dean Carlton, Dallas, Tex., Abraham N. Goldman, Chicago, Ill., Leo Greenfield, North Miami, Fla., W. D. Masterson, III, Kilgore & Kilgore, Dallas, Tex., Gene I. Mesh, James W. Schlueter, Cincinnati, Ohio, Gerald Urbach, Geary, Stahl & Spencer, Dallas, Tex., Arthur N. Abbey, Stuart D. Wechsler, Kass, Goodkind, Wechsler & Labaton, New York City, for plaintiffs.

D. L. Case, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., James J. Hagan, Simpson, Thatcher & Bartlett, New York City, Morris Harrell, Rain, Harrell, Emery, Young & Doke, Wilson Herndon, Strasburger & Price, Justin J. Karl, Dallas, Tex., Henry L. King, Davis, Polk, Wardwell, New York City, Jenkins & Gilchrist, Wm. Woodburn, Dallas, Tex., Peter A. White, Fulbright & Jaworski, Washington, D. C., T. Paine Kelly, MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for defendants.

## MEMORANDUM OPINION AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

### On Class Certification

On July 17, 1978, LTV announced that trading in its securities would be suspended for 10 days due to possible adjustments that might later be made to the value of its steel subsidiary's inventories as then reflected on its books. On October 13, 1978, LTV announced a restatement of its earnings for the years 1974 through 1977. This restatement of earnings is said to have been made necessary by questionable procedures for accounting for J&L inventory. With nine types of publicly–traded securities, the re-

statement produced, not surprisingly, eight lawsuits, each seeking certification of classes of security holders.[1] On May 8, 1979, the Judicial Panel on Multidistrict Lit-

1. The complaints flowing from the announced restatement include:
    1. *Bronheim v. LTV, et al* (N.D.Tex.);
    2. *Kent v. LTV, et al* (N.D.Tex.);
    3. *Model Assoc., Inc. v. LTV, et al* (S.D. Ohio);
    4. *Marhart, Inc. v. LTV, et al* (N.D.Ill.);
    5. *Reynolds v. LTV, et al* (N.D.Tex.);
    6. *Fruchthandler v. LTV* (E.D.N.Y.) ("Fruchthandler I");
    7. *Fruchthandler v. LTV, et al* (E.D.N.Y.) ("Fruchthandler II"); and
    8. *Feldman v. LTV* (N.D.Tex.).

While the complaints were commonly threaded by a claimed fraudulent practice revolving around inventory accounting errors, they did not all allege the same claims. Because their allegations provided background to the later discussion of the adequacy of each class representative, they are described in this footnote (drawn from defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Action Certification):

(a) *Bronheim.* The *Bronheim* complaint was filed on July 27, 1978, two and one–half months before the restatement was announced and the day after LTV's ten–day suspension of trading; it was amended on February 20, 1979. The amended complaint named as defendants LTV, J&L, E&W, 45 individuals who were or are presently officers or directors of LTV or J&L and two underwriters, Goldman Sachs and Lehman Brothers.[a] The amended complaint was framed in nine separate counts, each of which purported to concern itself with every transaction (other than sales) in every LTV security between January 1, 1975 and July 27, 1978, the date the original complaint was filed. On this basis, each count alleged against various different and overlapping groups of defendants varying violations of the federal securities laws and of the common law.

[a] The amended complaint also alleges a defendant class composed of all underwriters who participated in the three public offerings of LTV securities during the 1975 to 1978 period.

*Count I* was brought against LTV, J&L and the 45 named individuals alleging violations of §§ 10 and 17 of the 1934 Act.

*Count II* was brought against E&W alleging violations of the same provisions of the 1934 Act as in Count I.

*Count III* was brought against all the defendants alleging violations of §§ 11 and 12 of the 1933 Act.

*Count IV* was brought against the 45 individual defendants alleging violations of § 15 of the 1933 Act and § 20 of the 1934 Act.

*Count V* was brought against all the defendants alleging violation of § 18 of the 1934 Act.

*Count VI* was brought against all the defendants alleging common law fraud.

*Count VII* was brought against E&W alleging common law negligence.

*Count VIII* was brought against all the defendants except E&W alleging common law negligence.

*Count IX* was brought against all the defendants alleging violations of § 27.01 of the Texas Business and Commerce Code.

Plaintiff Bronheim, who himself purchased LTV's 7½% Convertible Notes and shares of its common stock,[b] sought in his complaint to represent a class composed of everyone who purchased or exercised or exchanged or converted any security of LTV between January 1, 1975 and July 27, 1978.

[b] Bronheim also converted some of the 7½% Convertible Notes pursuant to LTV's August 1976 Notice of Redemption.

(b) *Kent.* The *Kent* complaint was filed on October 31, 1978, approximately two weeks after the restatement, and was amended on November 9, 1978. The amended complaint was brought against LTV, J&L, E&W, twelve individuals who were or are officers or directors of LTV or J&L and approximately 120 or more underwriters. The complaint was framed in six counts and alleged violations of §§ 11, 12 and 17 of the Securities Act of 1933 and §§ 10 and 18 of the Securities Exchange Act of 1934. Each count alleged violations of different provisions of the Acts against different defendants based on different transactions in LTV securities.

*Count I* was brought against all the named defendants except the underwriters and alleged violations of §§ 11, 12 and 17 of the 1933 Act and §§ 10 and 18 of the 1934 Act in connection with LTV's redemption of its 7½% Convertible Notes and 7½% Convertible Debentures in August 1976.

*Count II* was brought against the same defendants and alleged the violation of the same provisions of the federal securities laws as Count I in connection with LTV's offering of units of common stock and 9¼% Debentures in February 1977.

*Count III* was brought against the same defendants and alleged the same violations of the securities laws as Counts I and II in connection with LTV's offer to exchange its 5% Subordinated Debentures for 11% Subordinated Debentures in May 1977.

*Count IV* was brought against the underwriter defendants and alleged violations of §§ 11 and 12 of the 1933 Act in connection with the transaction described in Count II.

*Count V* was brought against all the named defendants, except the underwriters, and alleged violation of § 10 of the 1934 Act in connection with open market purchases of LTV's debt securities between January 1, 1975 and October 31, 1978.

*Count VI* was brought against the same defendants and alleged violation of the same securities laws over the same period as Count V

igation transferred these cases to this court pursuant to 28 U.S.C. § 1407, for coordinat-ed or consolidated pretrial proceedings. After some six months of pretrial proceedings,

but in connection with open market purchases of LTV common stock.

The plaintiff, Mrs. Kent, who herself purchased the units of common stock and 9¼% Debentures in the special offering of February 1977 referred to in Count II of her complaint, sought in her complaint to assert all these counts on behalf of a class composed of all purchasers of any security of LTV (except equity securities other than common), whether on the open market or otherwise, between January 1, 1975 and October 31, 1978.

(c) *Model Associates.* The *Model* complaint was filed on November 21, 1978, three weeks after *Kent,* and was amended on May 10, 1979. The amended complaint was brought against the same defendants as in the *Kent* action, with the exception that no underwriters were named, and was framed in two counts. Count I was brought against all the named defendants and alleged violations of §§ 11, 12 and 17 of the 1933 Act and §§ 10 and 18 of the 1934 Act in connection with purchases of LTV's 7½% Convertible Debentures and its 5% Subordinated Debentures. Count II was also brought against all defendants and alleged violation of § 10 of the 1934 Act in connection with open market purchases of all LTV debentures between January 1, 1975 and October 30, 1978.

(d) *Marhart, Inc.* The Marhart complaint was filed on December 6, 1978 and amended on May 21, 1979. The amended complaint was brought against the same defendants named in the *Kent* action, minus the underwriters, and contained three counts. Count I was brought against the named defendants and alleged violations of §§ 11, 12 and 17 of the 1933 Act and §§ 10 and 18 of the 1934 Act in connection with LTV's redemption of its 7½% Convertible Notes and 7½% Convertible Debentures for shares of common stock in August 1976. Count II was brought against all the defendants and alleged violations of § 10 of the 1934 Act in connection with open market purchases of LTV debt securities between January 1, 1975 and October 1978. Count III was brought solely against Ernst & Whinney and alleged violations of §§ 10 and 17 of the 1934 Act in connection with the transactions described in Counts I and II.

(e) *Reynolds.* The Reynolds complaint was filed on February 2, 1979, against the same defendants as in the *Kent* action minus the underwriters, and was framed in two counts. Count I was brought against all the named defendants and alleged violations of §§ 11, 12 and 17 of the 1933 Act and §§ 10 and 18 of the 1934 Act in connection with LTV's offer to exchange its 5% Debentures for 11% Debentures in May 1977. Count II was brought against all defendants and alleged violations of § 10 of the 1934 Act in connection with open market purchases of any LTV debentures between January 1, 1975 and October 31, 1978.

(f) *Fruchthandler I.* The Fruchthandler I complaint was originally filed on September 7, 1977, two months before the SEC investigation began. It contained no allegations with respect to J&L's inventory accounting, but rather alleged that LTV had violated § 11 of the 1933 Act by failing to disclose in connection with its February 1977 offering of units of common stock and 9¼% Debentures that it intended to sell four properties at an alleged loss of 45 million dollars. The original *Fruchthandler I* complaint was later amended to include the LIFO allegations, though it continued to be brought solely against LTV, on the basis of § 11 of the 1933 Act and only on behalf of purchasers in the Unit Offering of February 1977.[c]

[c] LTV consented to certification of the class alleged in the original *Fruchthandler I* complaint.

(g) *Fruchthandler II.* The Fruchthandler II complaint was filed on November 8, 1978 against LTV, J&L and E&W. The complaint, in one count, alleged violations of § 10 of the 1934 Act by the named defendants in connection with purchases of all LTV securities (other than the units offered in February 1977) between March 30, 1976 and November 18, 1977, the date the SEC investigation was announced.

(h) *Feldman.* The Feldman complaint was filed on December 11, 1979 naming as defendant the LTV Corporation. Count I alleged violations of § 10(b) of the 1934 Act on account of the accounting practices and Count II alleged common law deceit on the basis of the same accounting practices.

In summary, though the seven complaints transferred to this Court for coordinated pretrial proceedings were all based on LTV's restatement of earnings, they were not identical. They alleged from one to ten claims[d] against from one to over 135 different defendants[e] concerning from one to five different kinds of transactions[f] from one to 9 different kinds of LTV securities[g] over a period anywhere from a few days to several years.[h]

[d] *E. g., Fruchthandler II* alleged a violation of § 10 of the 1934 Act, while *Bronheim* alleged violations of §§ 11, 12 and 15 of the 1933 Act, violations of §§ 10, 17, 18 and 20 of the 1934 Act, common law fraud, common law negligence and violation of § 27.01 of the Texas Business and Commerce Code.

[e] *Fruchthandler I* named only LTV. *Kent* named LTV, J&L, E&W, 12 individuals and over 120 underwriters. (*Bronheim* named 45 individual defendants, including 37 not named in *Kent.* The combined number of different defendants named in the litigation totaled, therefore, considerably over 150).

[f] *Reynolds* concerned one type of transaction, the *exchange* of one security for another, spe-

all plaintiffs joined in a single request for certification of one class of security holders. On April 28, 1980, a hearing on class certification was held. The definition of any class to be certified is now before this court. On July 21, 1980, the seven suits were merged into one when all plaintiffs joined in the filing of a single amended complaint (hereafter "consolidated complaint"). The consolidated complaint drops numerous defendants and confines its claims to 'violations of § 10 of the Securities Exchange Act of 1934, Rule 10b–5, and §§ 11 and 12 of the Securities Act of 1933.

Defendants argue that no class should be certified, alternatively, that any class ought not contain both purchasers and sellers—"ins and outs," or persons who acquired their securities other than by open market purchase such as persons who bought under a prospectus and registration statement or by an exchange offer. The proffered class representatives wish to represent all persons who purchased any of eight classes of securities from April 28, 1975 through October 16, 1978.[2] Defendants are in substantial agreement with plaintiffs as to the proper time period of any class, except defendants argue that the period should start in February, 1976, and end in July, 1978. Defendants' time boundaries represent respectively the first time LTV had a duty to state 1975 earnings and the date trading was suspended to allow the market to absorb the news of the anticipated restatement of earnings.

In contending for no class, defendants deny the adequacy of representation tendered by the class representatives, point to claimed fatal conflicts among class members, and deny the class would be manageable, but place their greatest emphasis upon a claimed absence of predominating common issues. Defendants' argument in non–Rule 23 language is that no single issue adequately cements the discrete parts of the proposed class. The arguments present the extremes—from a "monstrous impossibility" to a "relatively simple" overriding issue of scheme to defraud. As will be seen, a position closer to a midpoint is charted by the case law.

### Restatement of Earnings

A restatement of earnings announced by LTV on October 13, 1978, is the target of the consolidated complaint. In November of 1977, the Fort Worth Regional Office of the Securities & Exchange Commission expressed reservations regarding recent financial statements of LTV and its steel subsidiary, J&L. Apparently the central question was that of an accounting of inventories. In the spring of 1978, LTV, with its accountants, Ernst & Whinney (formerly Ernst & Ernst) commenced an intensive examination of the accounting issues raised

cifically the exchange of the 5% Debentures for the 11% Debentures in May, 1977. *Bronheim* concerned at least five different kinds of transactions: (1) the *conversion* of debt into equity, (2) the *exchange* of one type of security for another, (3) the *exercise* of warrants, (4) the *purchase the open–market* of debt or equity, and (5) the *purchase* of debt or equity *pursuant to a public offering*, as in the case of the Unit Offering.

g *Marhart* alleged a class composed of purchasers of 7½% Convertible Debentures. *Bronheim* alleged, in part, a class composed of purchasers of every LTV security during the 1975 to 1978 period. As discussed *infra*, there were nine different types of such securities.

h *Fruchthandler I* was brought on behalf of purchasers of LTV's Unit Offering in February 1977. *Kent* concerned all purchasers of LTV common stock and debt securities from January 1, 1975 to October 31, 1978.

2. There were nine classes of securities traded. The consolidated complaint however does not attempt to speak for purchasers of an issue of 9¼% sinking fund debentures, due February 1, 1997, pursuant to a registration statement that became effective on or about February 1, 1977, and a prospectus dated February 1, 1977. Those purchasers are members of a class the certification of which was unopposed. *Fruchthandler v. LTV*, CA–3–79–0623–G. While *Fruchthandler* had attempted by amendment to add the class now at issue that effort was dropped with the filing of the consolidated complaint. *Fruchthandler* remains part of the MDL 371 cases for discovery purposes only. The interplay between the damage theory of members of the certified *Fruchthandler I* class and the damage theory of the members of the class certified here is now undefined. For this reason, retention of *Fruchthandler I*, at least for now, is appropriate for discovery purposes.

by the SEC investigation. The pendency of a merger with LTV and Lykes Corporation gave impetus to this self–examination process. After the review, LTV announced on July 17, 1978, that trading in its securities would be suspended for 10 days for possible adjustments to be made in J&L's inventories, which adjustments would affect previously announced financial results of both LTV and J&L for previous years. The anticipated announcement came on October 13, 1978, when LTV announced a restatement of its earnings for the period 1974 through 1977. Defendants concede that the announced restatement was a product of numerous changes in accounting procedures but argue that when viewed discretely, these changes had conflicting impacts upon LTV's earnings. That is, defendants emphasize the number and distinct character of the accounting changes made, pointing out that some of its accounting procedures actually caused an upward adjustment of income while others caused a downward adjustment of income. Yet the fact remains that the cumulative effect of all corrections was to decrease reported earnings by not insubstantial sums.

### The Consolidated Complaint

The substantive allegations of the consolidated complaint allege a "scheme and conspiracy" to defraud the members of the alleged class by the overvaluation of the inventories of J&L with a host of allegedly misleading documents (Cplt. ¶ 21). In paragraphs 22 through 48, the complaint details plaintiffs' allegations, for example, that LTV allegedly failed to adopt or embrace internal accounting controls (Cplt. ¶ 28), that it failed to adopt the link–chain method of valuation in 1975 (Cplt. ¶ 30), and that LTV and J&L sold 6,000,000 pounds of nickel ore in November 1975 at less than its cost of purchase with an attendant increase in LTV's consolidated net income for 1975 because of the effect of LIFO treatment (Cplt. ¶ 47). At paragraph 49 *et seq.* the complaint alleges the core facts underlying plaintiffs' claims of designation of current inventory items as new products. For example:

(1) The designation of "Rustenberg" nickel as a new product in 1975 in order to increase pre–tax income (Cplt. ¶ 51).

(2) The transfer of the manufacture of steel slabs in 1975 from Pittsburgh to Cleveland and their eventual designation by virtue of a new cost basis of manufacture as new items in order to increase pre–tax income (Cplt. ¶ 52).

(3) The classification of "Mid–Vol" Coal in 1975 as a new item despite its having been designated as a new product in 1974 with the effect that income in 1975 was increased by approximately $1.8 million (Cplt. ¶ 54).

(4) The addition to inventory in 1975 of certain pipe with the effect that income in 1975 was increased (Cplt. ¶ 53).

(5) The classification of Silver Bay pellets as a new item in 1976 with the effect that income for 1976 was increased (Cplt. ¶ 55).

(6) The designation of a special type of coke as a new item in 1976 with the effect that income in 1976 was increased (Cplt. ¶ 56).

Then, under the heading "Additional Improper Inventory Valuation," the consolidated complaint alleged, among other things:

(1) The transfer of Mid–Vol Coal from a wholly–owned subsidiary to J&L before its liquidation for merger into J&L with a consequent increase in 1976 income (Cplt. ¶ 66).

(2) The delay in 1976 in transferring coal from the books of the general office to the books of the plants with a consequent increase in 1976 income despite the absence of its connection with J&L operations as distinguished from plant (Cplt. ¶ 69).

(3) The purchase of Tilden Ore in December 1976 with a consequent increase in 1976 earnings (Cplt. ¶¶ 70–71).

Following a description of various allegedly false misleading financial statements and various public offerings, plaintiffs allege these various actions were part of a scheme for, among other objectives, inflating income and assets in the consoli-

dated financial statements of LTV, by manipulating the finances of J&L, in order to increase and misrepresent LTV's debt–equity ratio enabling it to restructure substantial corporate debt (Cplt. ¶ 86). In the final part of the "substantive" allegations of the consolidated complaint, plaintiffs detail the alleged effects of the restatement of LTV's consolidated earnings (Cplt. ¶¶ 87–97).

The consolidated complaint then frames three counts, as discussed, *supra*, alleging violations of the federal securities laws against varying groups of defendants. The first count (against LTV, J&L, and the individual defendants) relies on § 10(b) and Rule 10b–5. The second count is against Ernst and relies on § 10(b) and Rule 10b–5. The third count, against all defendants, is brought on behalf of those who purchased LTV's securities pursuant to the "Conversion," "Unit," and/or "Exchange" Offerings, to be described relying on §§ 11 and 12 of the Securities Act.

### The Proposed Class

The consolidated complaint seeks a single common class. It alleges only violations of the Federal securities laws and makes no pendent claims. The class proposed by the consolidated complaint consists of those who:

(a) Purchased shares of common stock, $5 Series A Preferred Stock, Class AA Special Stock of LTV, or both;

(b) Purchased LTV debt securities, common stock purchase warrants in the open market, or both;

(c) Exercised common stock purchase warrants;

(d) Converted 7½% Convertible Notes due December 1, 1977 or 7½% Convertible Debentures due December 1, 1981 into 2,300,436 shares of the common stock of LTV pursuant to a Registration Statement and Prospectus dated on or about August 5, 1976 ("Conversion Offering");

(e) Purchased 9¼% Sinking Fund Debentures due February 1, 1997, and 1,050,000 shares of the common stock of LTV pursuant to a Registration Statement and Prospectus dated on or about February 1, 1977 ("Unit Offering");

(f) Exchanged 5% Subordinated Debentures of LTV due January 15, 1988, for 11% Subordinated Debentures due July 1, 2007, pursuant to a Registration Statement and Prospectus dated on or about May 10, 1977 ("Exchange Offering").

Memorandum of Law In Support Of Plaintiffs' Motion For Class Action Certification, p. 1.

To place the class issues in perspective, one must keep in mind that during the proposed 3½ years class period there were nine different types of LTV securities traded on the open market. They included: (1) common stock; (2) $5 Series A Cumulative Preferred Stock; (3) Class AA Accumulating Convertible Special Stock; (4) 7½% Convertible Debentures due 1981; (5) 7½% Convertible Notes due 1977; (6) 9¼% Sinking Fund Debentures due 1997; (7) 5% Subordinated Debentures due 1988; (8) 11% Subordinated Debentures due 2007; and (9) common stock purchase warrants.

The proposed class membership is estimated to be at least 100,000 with an estimated 39,000 transactions of LTV common stock alone. Defendants point to the numbers of class members and the difficulties of their identification in their assertion that class notice would cost approximately $150,-000.

### The Rule 23 Standards

Although application of the prerequisites of 23(a) is often logically anterior to consideration of the elements of Rule 23(b)(3), the crucial issues here revolve around the question of the predominance of questions of law or fact common to the members of the class over those affecting only individual issues. That is, the proffered class is patently so numerous that joinder of all members is impracticable and there are indisputedly questions of law or fact common to the class. But it is not so apparent that the common issues predominate over noncommon issues nor that the claims or defenses of the representative party are "typical" of

the claims or defenses of the class nor that the representatives proffered will necessarily and fairly protect interests of the class. The answer to the questions posed by 23(a)(3) and 23(a)(4) will here be foreshadowed by the analysis under Rule 23(b)(3). This is true because there are several representatives proffered and the question of typicality of claims or defenses is not wholly separable from the inquiries called for by an analysis of the predominance of issues. For this reason, the court proceeds first to the question of "predominance of issues."

Plaintiffs argue that there are six common issues. They are:

(1) Whether the defendants engaged in schemes and artifices to defraud purchasers of LTV securities;

(2) Whether the defendants misrepresented or omitted facts in the financial statements of LTV;

(3) Whether the misrepresented or omitted facts caused the securities of LTV to be sold at artificially high prices;

(4) Whether defendants, with the intent to deceive, deluded the 'investing market' by failing to disclose the true picture of the financial condition of LTV;

(5) Whether proper accounting and auditing procedures were followed in connection with the audits of LTV and J&L and the resulting impact upon issued financial reports; and

(6) Whether defendants engaged in acts and conduct in violation of §§ 11 and 12 of the Securities Act of 1933 and § 10 of the Securities Exchange Act of 1934, and Rule 10b–5.

Memorandum Of Law In Support Of Motion For Class Action Certification, pp. 8–9.

While the substantive claims of the consolidated complaint have differing, if overlapping, elements, their common thread is that the misrepresentations and omissions of LTV and the defendants regarding the accounting for inventory violated Rule 10b–5. For this reason the court will first examine the question of class certification focusing upon the elements of Rule 10b–5. We will then consider whether the inclusion

of other securities law violations alters this analysis.

■ In this circuit, the elements of a 10b–5 violation are:

a misrepresentation or omission or other fraudulent device, the plaintiff's purchase or sale of securities in connection with the fraudulent device, the materiality of the misrepresentation or omission, the defendant's scienter in making the misrepresentation or omission, the plaintiff's justifiable reliance on the device (or due diligence against it), and the plaintiff's damages resulting from the fraudulent device.

*Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 193–94 (5th Cir. 1979), *mod'd on other grounds*, 611 F.2d 105 (1980).

Defendants have argued that the reliance element of the plaintiffs' affirmative case of 10b–5 representation will vary with every member of the proposed class in that actual reliance by each member of the proposed class needs to be shown, and that when this is weighed in the calculus of predominance under Rule 23, no certification is possible; that this case cannot be so completely cast as an omissions case as to avoid the requirement of proving that each class member relied. The answer of plaintiffs to this assertion is that individual proof of reliance is unnecessary where, as here, plaintiffs' allegations include a "fraud on the market" claim. *Cf. Wolgin v. Magic Marker Corporation*, 82 F.R.D. 168, 174 (E.D.Pa.1979).

The predomination calculus here is not difficult once the identification of common and discrete questions is complete. The first common question is whether the decisions to account for inventory were made with the requisite scienter. This is a common question of law and fact. Stopping here leaves us, however, only with a class-wide determination of illegality. If we are then left with 100,000 trials of questions of reliance, it becomes obvious that there is no predomination of the scienter issue (which has subsumed a question of wrongfulness at

all) over the remaining issues, nor would the "class" be manageable. If we add as a common issue the questions of fraud on the market and the width of the damage "ribbon" there is an immediate flip in result. These common issues would predominate and the class would be manageable (if with great effort). The specter of thousands of mini–trials of the reliance question and damage amounts would then not now seem sufficiently palpable to override the economies of a single trial. Each class member (putting to one side briefly all other then open market investors in LTV common) will be presumed to have relied upon the market–a presumption that we may assume will carry the day in the great percentage of claimants. The calculation of each member's damages would–because as otherwise noted, an out–of–pocket theory is required–be largely mechanical, the width of the damage ribbon by necessity having been earlier proved. The determinant then, at least for a class of open market investors, becomes whether we accept a fraud on the market theory in this circuit. We turn now to that question.

### Fraud on the Market

The Second and Ninth Circuits have both suggested that a plaintiff need not show individual reliance upon particular misrepresentations when a "fraud on the market" claim is raised. *See, e. g., Blackie v. Barrack*, 524 F.2d 891, 906–07 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Ross v. A. H. Robins Co.*, 607 F.2d 545, 553 (2d Cir. 1979). *Cf. Rifkin v. Crow*, 574 F.2d 256, 263 (5th Cir. 1978); *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1271 (9th Cir. 1979); *Arthur Young & Co. v. United States District Court*, 549 F.2d 686, 694–95 (9th Cir. 1977), *cert. denied*, 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977). *Accord, Wolgin v. Magic Marker Corp., supra*. Under this theory, a plaintiff asserting fraud on the market need not allege individual reliance but only that the plaintiff relied upon the integrity of the market price of the security which was distorted by the impact of the particular misstatements. *See also Panzirer v. Wolf*, CCH Fed.Sec.L. Rep. ¶ 97,251 (S.D.N.Y.1980); *In re Commonwealth Oil/Tesoro Petroleum Securities Litigation*, 484 F.Supp. 253, 268 n.4 (W.D. Tex.1979). Reliance is *presumed* once it is shown that a misrepresentation is material, or, what is substantially identical given the concept of materiality–once it is established that the material misrepresentation affected the price of stock traded on the open market. *See Blackie v. Barrack, supra*, at 906; *Ross v. A. H. Robins Co., supra*. Market reliance theory can also be viewed as an extension of the presumption of reliance in omission cases to misrepresentation cases involving market transactions. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Rifkin v. Crow, supra*, at 263; *Ross v. A. H. Robins Co., supra*, at 553.

The status of the presumption of reliance on a "fraud on the market" situation in the Fifth Circuit is unclear. Rehearing *en banc* was granted on May 2 in *Shores v. Sklar*, 610 F.2d 235 (5th Cir. 1980), the only Fifth Circuit case which confronted the "fraud on the market" theory, relying on it for analogical support. *See also Rifkin v. Crow, supra*, at 263; *Kornick v. Talley*, 86 F.R.D. 715 (N.D.Ga.1980). This court anticipates that this Circuit will follow the Second and Ninth Circuits,[3] at least as to securities traded in substantial and active markets. With recent advances in the understanding of the economics of securities markets, it has become more demonstrable that reliance on the market price is conceptually indistinguishable from reliance upon representations made in face–to–face transactions. These advances have validated assumptions underlying the adoption of

---

**3.** *Cf., e. g.*, Note, *The Future of the Reliance Requirement in Private Actions Under the SEC Rule 10b–5: A Proposal*, 9 Cumberland L.Rev. 721, 749 (1979); Note, *The Reliance Require-ment in Private Actions Under SEC Rule 10b–5*, 88 Harv.L.Rev. 584, 592–96 (1975). *See also Sargent v. Genesco, Inc.*, 75 F.R.D. 79, 85 (M.D. Fl.1977) (dicta).

the theory and themselves offer an additional reason why adoption is reasonable.[4]

*Blackie* explained the rationale for extending the *Ute* presumption of reliance to "fraud on the market" cases, *Rifkin v. Crow, supra*, at 263:

> A purchaser on the stock exchanges . . . relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price—whether he is aware of it or not, the price he pays reflects material misrepresentations. Requiring direct proof from each purchaser that he relied on a particular representation would defeat recovery by those whose reliance was indirect, despite the fact that the causational chain is broken only if the purchaser would have purchased the stock even had he known of the misrepresentation.

*Blackie v. Barrack, supra*, at 907. The presumption can be considered as recognition of the market's role as a transmission belt linking the misrepresentation and the individual purchaser or seller. As the *Blackie* court stated:

> Proof of reliance is adduced to demonstrate the causal connection between the defendant's wrongdoing and the plaintiff's loss. We think causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance. Materiality establishes the reliance of some market traders and hence the inflation in the stock price—when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case.

*Id.* at 906. In face–to–face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face–to–face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price. If the investor did not rely on such agent, there has been no reliance. Thus a defendant should be able to attack such an investor's claim in much the same way he would in a face–to–face transaction–being

---

4. Defendants assert that even were a fraud on the market theory adopted, independent questions would still predominate: (i) the "theory would not apply to any purchases of LTV securities in which the price was set by LTV itself rather than by the market, *e. g.*, the 'unit offering' and the 'exchange offering.'" (ii) "a host of individual questions would still exist despite the presumption because defendants could rebut the presumption, in the words of the *Crow* court, 'by proving' that the plaintiff purchased despite knowledge of the misrepresentation or omission or that he would have purchased had he known of it." *See* Memorandum of Law in Opposition to Plaintiff's Motion for Class Action Certification, at 37.

Both arguments fail. Given that LTV securities had been trading even prior to the unit and exchange offerings, the price "set" by LTV is not an independent decision made by LTV but involved a relatively mechanical task of what the market as a whole is willing to pay for LTV securities in yet another impersonal context. At the least we leave that relationship to the proof. Misleadingly optimistic representations may distort the market price of secondarily traded securities and affect what the market is willing to pay for new offerings. If so, fraud is committed on the market in the latter situation as well. *Cf. Shores v. Sklar, supra*, at 239–40 (new bond offering).

As for the second argument, the possibility that defendants may attempt to rebut the presumption of reliance as to each class member is not enough to defeat class action. *Cf. Simon v. Westinghouse Elec. Corp.*, 73 F.R.D. 480, 486–87 (E.D.Pa.1977). There may be many class member claims resisted in separate "trials." It is unrealistic, however, to now assume that because reliance would only be "presumed" the supposed common issue will unravel into thousands of unmanageable "mini–trials." This is true, given the force of the presumption (carrying a burden of proving a purchase would have been made even if the truth were known) with the resulting reality that the contest would likely be futile in the vast number of cases.

allowed to offer proof that the reliance was upon matters extraneous to the market (to rebut the presumption).

The reasonableness of a presumption turns either on the empirical validity of the fact presumed or upon a policy sufficient to justify placing the burden of proof where it would not naturally be under our adversary system. Recent economic studies tend to buttress empirically the central assumption of the fraud on the market theory–that the market price reflects all representations concerning the stock. Indeed, economists have now amassed sufficient empirical data to justify a present belief that widely–followed securities of larger corporations are "efficiently" priced: the market price of stocks reflects all available public information–and hence necessarily, any material misrepresentations as well. *See* J. Van Horne, *Financial Management and Policy* 48 (4th ed. 1977); J. Francis & S. Archer, *Portfolio Analysis* 193 (1971); C. Coates, *Investment Strategy* 363 (1978); B. Malkiel, *The Inflation Beater's Investment Guide: Winning Strategies for the 1980's* 64 (1980). *Cf. Seaboard World Airlines v. Tiger International*, 600 F.2d 355, 361–62 (2d Cir. 1979) (description of "efficient market theory").

In more technical terms:

Basically, efficient capital markets exist when security prices reflect all available public information about the economy, about financial markets, and about the specific company involved. Implied is that market prices of individual securities adjust very rapidly to new information. As a result, security prices are said to fluctuate randomly about their "intrinsic" values. To be sure, new information can result in a change in the "intrinsic" value of a stock, but subsequent stock price movements will follow what is known as a *random walk.*

Van Horne, *supra*, at 45. "Semistrong" [5] tests of market efficiency show that stock prices adjusted quickly to public announcements concerning the company: the "collective action of a sufficient number of market participants buying or selling the stock causes a very rapid, if not virtually instantaneous, adjustment in price." The price of the stock appears to reflect all publicly available information, but not all privately held information. *Cf., e. g.*, Note, *Disclosure of Future–Oriented Information Under the Securities Laws*, 88 Yale L.J. 338, 344 n.32 (1978) (insiders consistently outperform the market). And the market price of a security will approach its true value only when reliable information is available to the market. *Id.* at 341. The prices of stocks of larger corporations, such as those listed on the New York Stock Exchange, seem especially efficient. *See* Van Horne, *supra*, at 48; Coates, *supra*, at 363; Francis & Archer, *supra* ; Malkiel, *supra.*

The fraud on the market theory does not eliminate the element of reliance but places it where in open market transactions it realistically belongs–connecting the purchaser to the market, not the specific misstatement. Many investors not only rely "generally on the supposition that the market price is validly set," *Blackie v. Barrack, supra*, at 907, but utilize the very efficiency of the market as the affirmative basis for making securities purchases. These investors rely directly on the market to evaluate information for them rather than making their independent analysis of stocks; any reliance of the market on information is thus reliance by these investors.

If intelligent people are constantly shopping around for good value, selling those stocks they think will turn out to be overvalued and buying those they expect are now undervalued, the result of this action by intelligent investors will be to

---

**5.** These are empirical tests of efficiency concerned with the speed of price adjustment to new information. *Id.* at 47. Courts must be wary of embracing particular economic theories. We subscribe to a dispute resolution structure of generalist judges who may use the data of social scientists and consider their proffered suggestions but who resolve the dispute

before it within the court's own "legal" analytical framework. We do not ignore the force of the social scientist's contributions for we have no monopoly upon the discovery of truth; but the method of the scientist is not a mirror image of the legal method. *See* Higginbotham, *Scientists Are Not Prophets*, Judges' J., Fall '79, p. 16.

have existing stock prices already have discounted in them an allowance for their future prospects. Hence, to the passive investor, who does not himself search out for under– and overvalued situations, *there will be presented a pattern of stock prices that makes one stock about as good or bad a buy as another. To that passive investor, chance alone would be as good a method of selection as anything else.* Paul Samuelson, *quoted in* Malkiel, *supra,* at 63. Professor Malkiel describes various institutional investors that rely on this efficient market hypothesis by simply buying a random cross–section of stocks. *Id.* at 149–50. *See also* Coates, *supra,* at 365–66 (re "index" funds). After all–as the efficient market hypothesis would predict–it has been suggested that no scientific evidence has yet been offered which shows that the investment performance of professionally managed portfolios as a group has been any better than that of randomly selected portfolios (for a given level of risk).[6] *Id.* at 62 and 71.[7]

It is equally certain that some investors rely not on the market evidence of value but on their own assessment of released information. Rugged individuals who persist in a different assessment of value may prove to be correct in the long haul but they still remain dependent on the market to make that decision. Even those investors who "rely" upon the specific misrepresentations are doing so upon an assessment of the translation of the value of the representation expressed in the market. That is because the ultimate reliance is still upon the market's pricing of information.

Nor is the fraud on the market theory inconsistent with the congressional purpose of the securities acts. A central goal of the '33 and '34 acts is disclosure. A fair and efficient market for investment securities is at the mercy of inadequate and inaccurate information. That is, disclosure and a fair and efficient market go hand in hand because market efficiency is a vital transmission link of disclosure. *Cf. Disclosures of Future–Oriented Information Under the Securities Laws, supra,* at 338. Inaccurate information may result in skewed costs of capital and distort market prices of securities. *Id.* at 340–41. In view of the dependence of the public upon the integrity of the market and its efficiency in market pricing, and to further legislative goals, the focus of reliance, if it is to relate to the marketplace in a realistic way, must be upon the relationship between the investor and the market. The presumption of that connection is no more than a legal expression bottomed on this reality.

This increase in procedural efficiency ought not increase the chances of improperly finding liability. Of course it can be argued that to the extent any increase in exposure to liability is a product of increased procedural efficiency and not an easing of substantive standards, the result is to be desired. *Cf. The Future of the Reliance Requirement in Private Actions Under SEC Rule 10b–5: A Proposal, supra,* at 749. That argument is conceptually sound. It fails, however, to address the true ability of corporations to sustain the

---

**6.** For simplicity, we have avoided interposing the concepts of risk and portfolio in the above discussion. *See, e. g., id.* at 65–75; Note, *The Conflict Between Managers and Shareholders in Diversifying Acquisitions: A Portfolio Theory Approach,* 88 Yale L.J. 1238, 1239–41 (1979); Modigliani & Pogue, *An Introduction to Risk and Return,* Financial Analysts Journal, March–April 1974 (first part) and May–June 1974 (second part).

**7.** Believers of the efficient–market hypothesis have been known to deride the utility of traditional investment techniques. *Cf., e. g.,* Coates, *supra,* at 134; J. Francis & S. Archer, *Portfolio Analysis,* vii, 3–5, 162, 185–88 (1971);

Malkiel, *supra,* at 46 and 62 (reason for ineffectiveness of "fundamental analysis").

But even among academics, the strongest proponents of the efficient market hypothesis, there are some doubts. *See, e. g.,* Malkiel, *supra,* at 63–64; Bernstein, *In Defense of Fundamental Investment Analysis,* Financial Analysts Journal, Jan.–Feb. 1975, at 57. Overall, the investment community continues to act as if undervaluation can be detected. *Disclosure of Future–Oriented Information Under Securities Laws, supra,* at 342 n.22. *See also* Treynor, *Editorial Viewpoint: Efficient Markets and Fundamental Analysis,* Financial Analysts Journal, March–April 1974, at 14.

risk of trial faced with large certified classes. Their *in terrorem* effect is powerful. That so few of these cases are tried is in no small part a consequence of this reality. Thus to blandly accept the idea that all we do here is alter procedure fails to recognize the symbiosis of procedure and substance in Rule 23 litigation. However, the answer to this dilemma resides with Congress, not a court possessed of interstitial powers.

In sum, this court anticipates that the Fifth Circuit will join the Second and Ninth in adopting a "fraud on the market" theory for cases such as this. We confine our holding to securities with active and substantial markets, as distinguished from less compelling fact situations such as that of *Shores v. Sklar, supra.*

We turn now to the question of whether a different result obtains with the claims under §§ 11 and 12 of the Securities Act of 1933. The following chart, provided by plaintiffs, compares the elements of proof among 10b, §§ 11 and 12:

| Section 10(b)<br>15 U.S.C. § 78j | Section 11<br>15 U.S.C. § 77k | Section 12<br>15 U.S.C. § 77l |
|---|---|---|
| Scheme to defraud, misrepresentation or omission or fraudulent course of business. | Misrepresentation or omission in registration statement. | Misrepresentation or omission in prospectus. |
| Materiality required. | Materiality required. | Materiality required. |
| Scienter (of some level). | Scienter not required. | Scienter not required. |
| Omissions: Reliance not required. | Reliance not required (except with respect to the 1 year provision of § 11(a)). | Reliance not required. |
| Misrepresentations: Reliance may not be required in a "fraud on the market" case. | | |
| Damages required; courts have adopted various measures. | Damages required; statutory measure. | Damages required; statutory measure. |
| | **STATUTORY DEFENSES** | |
| None | LTV (Issuer): None | None |
| | Non-Issuer Defendants: Various statutory defenses of a rebuttal nature. | |

This chart reveals the substantial overlap of elements among the three claims. The precise measure of recklessness under 10b–5 is not yet clear; it is thus uncertain whether it overlaps with that of §§ 11 and 12. It appears, of course, that scienter is not required under Securities Act provisions of §§ 11 and 12. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 1381 n.12, 47 L.Ed.2d 668 (1976) wherein Justice Powell stated:

In this opinion, the term "scienter" refers to a mental state embracing intent to deceive, manipulate or defraud. In certain areas of the law, recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. *We need not address here the question whether in some circumstances reckless behavior is sufficient for civil liability under Section 10b and Rule 10b–5.*

(Emphasis supplied). And in *Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), Justice Stewart stated:

The term "scienter" is used throughout this opinion, as it was in *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, at 193 n.12, 96 S.Ct. 1375, at 1381 n.12, 47 L.Ed.2d 668, to refer to "a mental state embracing intent to deceive, manipulate or defraud." We have no occasion here to address the question, reserved in *Hochfelder*, ibid., whether, under some circumstances, scienter may also include reckless behavior.

*Id.* at n.5, 100 S.Ct. at 1950 n.5.

Assuming, without deciding that scienter is not an element under § 11 or § 12 and assuming that the scienter standard for 10b–5 differs from that of § 11 or § 12 no major trial problems are presented. The device of Rule 49 interrogatories should accommodate any differences that may then exist. The lessons learned from the trial of 10b–5 cases in the courts before *Hochfelder* are instructive. Then, the state law of fraud of Texas did not require proof that misstatements knowingly made were known to be false, while 10b–5 arguably did. A succession of "progressive" liability questions under Rule 49 proved to be adequate devices for accommodating the Texas standard and the then uncertain 10b–5 standard. No reason now appears why this or similar techniques will be inadequate on trial of liability.

Nor does the materiality question cause a different result. There appears to be substantial similarity as to the definition of materiality among 10b–5, §§ 11 and 12 definitions of materiality. It follows that the differences, to the extent they exist, do not change the predomination analysis of 10b–5. Finally, we cannot anticipate the course of discovery. It may well be that with the flesh of facts subclasses will be necessary, particularly as to other than open market investors. *See* n.4 *supra.*

### Time Period of Class

Plaintiffs argue that the beginning date of the proffered class should be April 28, 1975 and that it should end on October 16, 1978. Defendants contend that any class period ought not commence before February 4, 1976, and must end on July 17, 1978. Defendants' argument is that the earliest date for the commencement of a class would be February 4, 1976, the first announcement of restated 1975 earnings. Plaintiffs respond that this argument assumes that because earnings were restated upon an annual basis, there was no fraud in the quarterly reports of '75, the first of which was released on April 28, 1975. At this juncture of their argument, both plaintiffs and defendants delved into a discussion of certain deposition testimony, pointing up one of the perplexing questions of Rule 23 litigation. And that is the extent to which the court and parties ought to (or may) examine the "merits" of litigation in answering the questions posed by Rule 23 analysis. At the least, plaintiffs must show the existence of common questions with regard to its earlier period. The question is not necessarily when LTV first announced earnings now under attack. The question is whether any of the 1975 quarterly earnings were infected by the accused conduct. The court has reservations as to whether plaintiffs can make out a claim with regard to the 1975 period, but believes a sufficiently substantial question has been presented such that the class period must commence at the earlier time period proffered, April 28, 1975. Should later discovery reveal this to be in error, the court can redefine the class period.

■ As to the class' other limits, LTV argues forcefully that any date after July 17, 1978, would present class members whose claims necessarily would be inconsistent with plaintiffs' dependence upon the fraud on the market theory. LTV points to the circumstance that on July 17, 1978, it announced its request to the SEC to suspend trading in the securities for 10 days with a press release specifically stating that adjustments to the inventory value of J&L Steel Inventories "would have a materially adverse impact on the reported results of the operations of J&L Steel and of LTV." This news, which can only be described as having a substantial effect on the market, is said to be insufficient by plaintiffs. Plaintiffs argue that until the exact amount of the restatement of earnings was

made known the earlier cutoff point is untenable. By this plaintiffs are at least implicitly arguing that market reliance ought to be presumed despite the announcement to the market. Plaintiffs' heavy dependence upon the "fraud on the market" theory cuts against them. It is the sensitivity of the open market and its ability to sort the data bits into mosaics of value that underpins any validity of the fraud on the market theory. No one contends this market turned stone deaf on July 17, 1978. It follows that with the announcement made and the trading having been suspended for 10 days, those persons who purchased thereafter are not members of the same class as those who purchased earlier. The post–announcement purchasers are confronted with factual defenses unique to them. More specifically, post–announcement purchasers would be hard put to travel upon a fraud on the market theory. Instead, these purchasers present the court with individualized assessments different from those who purchased before. This is true because post–suspension of trading purchasers if they relied on a market (presumably adjusted) were not injured. Reliance upon other than the market, such as representation, will require that each claimant prove reliance. This individualized assessment causes a different result in the predomination analysis made.

For these reasons, the class period will commence on April 28, 1975, but will end on July 17, 1978. *Cf., e. g., Memorex Security Cases*, 61 F.R.D. 88, 97 (N.D.Cal.1973).

### Class Membership

The central definitional problem here posed by the requirement of membership is that of "ins and outs." Plaintiffs argue that the class should include persons who both bought and sold within the class period. Defendants, without conceding the propriety of any class, urge that a person who both bought and sold, as a matter of law,

has suffered no injury by any inflated market price. This argument has, because of its simplicity, immediate appeal. But this argument fails to deal with the circumstance that one who has both bought and sold in the "tainted market" may nonetheless have suffered an injury. Inquiry into matters of the measure of damage is not ordinarily made at the class certification stage. Here, however, the question at the threshold is whether injury was suffered at all, and if injury was suffered, whether its calculation presents such differences between those who sold before disclosure and those who sold thereafter that in the trial of liability the longward glances to the impact of the width of the damage ribbon will present such divergent objectives that the class ought not be certified. That is, whether or not because of differing objectives and differing damage proof, the requisite common core of interest is lost.

There is little need to burden the reports with explications by this court of the theory of value–price line analysis. *See Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1341 (9th Cir. 1976) (Sneed, J., concurring). In the language of that analysis,[8] this court's certification proceeds on the assumption that damages will be determined by the out–of–pocket measure. It follows that the creation of a "value line" is essential to the maintenance of the class.

"If anything is currently the rule of damages under 10b–5, it is the out–of–pocket award." *The Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities*, 26 Stan.L.Rev. 371, 383–84 (1974). Under this measure of damages, a defrauded buyer can recover the value of the consideration he paid for the security less the actual value of the security he received, all measured at the time of the transaction. Jacobs, *The Measure of Damages in Rule 10b–5 Cases*, 65 Geo.L.J. 1093, 1099 (1977). The purpose of this measure is

---

**8.** At the risk of injecting an additional and perhaps confusing metaphor, this court prefers to describe the theory as damage ribbon analysis. Plaintiffs must prove the existence and width of that part of the market price across time due to misrepresentation, which when graphed will, of course, look like a ribbon. The court leaves the choice of ribbon color–crimson or black–to the litigants.

to determine not what plaintiff might have gained, but what he actually lost. This rule is the traditional and basic measure of damages in 10b–5 actions, and we adopt it here. *See Bridgen v. Scott*, 456 F.Supp. 1048, 1060 (S.D.Tex.1978); *Sharp v. Coopers & Lybrand*, 83 F.R.D. 343, 347 (E.D.Pa.1979).

This selection of damage measure answers the question of the inclusion of persons who bought and sold. As Judge Sneed observed, where one has sold before the period of disclosure, there is an uncertainty with regard to whether the difference between the price and value line remains constant. If the width of the "damage ribbon" has remained constant, a class member who both bought and sold before disclosure has in theory recouped from the open market his "costs of misrepresentation." Should the difference between the price and value lines diverge, that is, "value" misrepresentation increase, no problem is presented by the purchaser who sells before disclosure because he has not been hurt by the misrepresentation. The in and out in a market where the price and value line has converged presents a different picture. From the market the seller recovers only part of the original value of the misrepresentation for which he paid full value. Pertinent to the present inquiry is the result that ins and outs have the incentive to shape the evidence in the fashion best suited to create a divergence of the value and price lines whereas those who have not sold before disclosure lack such incentive. The precise conflict is between those persons who sell before disclosure and are interested in narrowing the spread between the price and value lines and those who then purchase who will be interested in increasing that spread.

If the analysis of *Green v. Occidental Petroleum* be valid, the sole remaining certification question presented by ins and outs is whether the conflicting objectives of class members as to the placement of the value and price lines is such as to deny certification or whether it is curable by the device of subclassing. There is little empirical data to accurately predict the success of factors presented by this choice. The court

is inclined to follow suggestions of Judge Sneed that subclassing has the potential to cure any such problems. It follows that a definition of the class should include persons who have both bought and sold during the class period.

We do not find such a potential conflict to be sufficient to deny class certification. Significantly, available techniques of proof such as econometric modeling are sufficiently demanding of internal consistency as to reduce the opportunity for such manipulation of data.

### Class Representatives

Rule 23(a)(4) requires that "the representative parties will fully and adequately protect the interests of the class." While numbered as the fourth prerequisite of Rule 23(a), adequacy and representation may indeed be the touchstone of Rule 23 certification. At the least it lies near the heart of the preclusive effect of the adjudicated class question. The inquiry into adequacy of representation is an inquiry into the complex interplay of the willingness of a lay person to prosecute a claim and the expertise of his advocate assisting lawyer. Added to willingness is the requirement that the representative be adequate which contains implicit assumptions that the substantive area probed by the litigation be one in which the counsel is competent. Each of the elements of Rule 23 have a subsuming quality that tends to carry with it the ingredients of each of the other elements. That is, for example, a person who is not a member of a class would not be adequate; nor would a class representative whose claims was not typical be adequate or for that matter a class member. In one sense the determination of adequacy is simply the penultimate label of class certification. In another sense it is a rule required different focus upon the same problem.

The arguments have tended to focus upon the proper class representatives seriata and the court will also do so.

■ 1. *Bert Bronheim*: There is little to say about Bronheim. The briefs of the

parties set out various contentions. The court finds no serious question with regard to the adequacy of Bronheim and finds him to be adequate. A vice president of a textile corporation, he has been trading in securities for about 30 years. Deposition, at 10 and 107. He has been quite involved in stock market transactions, even to the extent of trading in puts and calls. *Id.* at 80 and 107. He has entered into a number of transactions involving LTV securities, is financially able to prosecute the action (being blessed with comfortable income and assets), and has demonstrated that he desires to do so. He is represented by experienced and able counsel.

2. *Model Associates, Inc.; Marhart Inc.; Gladys L. Kent*: The court finds that each of these are adequate class representatives. The only serious attack launched against the adequacy of these proffered plaintiffs is that Stanley Marks was an alter ego of Model Associates, Inc. and that Gladys Kent should be barred from acting as class representative because Marks was a partner in the firm of HKM. The response is that HKM by April 30, 1979, did not exist and that Marks had no potential liability in the outcome of the litigation because of an earlier association with the firm in which he has no continuing interest in the profit sharing losses. Kent further points out contrary to defendants' claim, that she did include the brokerage firm of Hemmerslag, Kemper, and Marks, the firm at issue in her complaint.

■ 3. *William Reynolds*: Defendants launched a multi–pronged attack against the proffered representation of Reynolds. For example, defendants argue that his failure to disclose in depositions his prior involvement as a defendant in a 10b–5 suit suggests a disqualifying absence of candor. While the nondisclosure of involvement in a 10b–5 suit is dismaying–if Reynolds was indeed so involved–Reynolds' other attributes are sufficiently strong to justify his inclusion. He is an executive vice president on the board of directors and executive committee of Reynolds Metals. Deposition, at 8. Reynolds owns a substantial number of securities, has several brokers, and appears to trade actively (either for his own account or as a trustee). Deposition, at 24, 28, 48, 56–57.

Second, defendants suggest that Reynolds, because he is acting as trustee for Louise Reynolds Florman, would be in breach of his fiduciary duties if he were to expend substantial funds to recover at most nominal damages. This argument fails as well both because it is unclear whether damages would indeed be nominal, and because the attorneys' fees involved are on a contingency basis. Deposition at 42–43.

Third, defendants suggest that having made his only purchase before the class period began his claim, if he is a class member at all, is not typical. Reynolds exchanged LTV debentures in 1977, within the class period.

No reason appears why Reynolds cannot serve as a class representative.

■ 4. *Feldman*: Mrs. Feldman has a B.S. degree from Cornell and an M.B.A. degree from Adelphi University. The wife of a dentist, she has a management consultant firm offering services to nonprofit corporations. She and her husband are financially successful with substantial assets and income. While she has invested in other stocks, including 1000 shares of IBM, she has never been a party to a lawsuit.

Mrs. Feldman first purchased LTV common stock in late 1974 by converting Omega–Alpha debentures purchased in 1972. The conversion gave her 2,665 shares of LTV common. On July 14, 1975, she purchased an additional 335 shares to bring her total holdings to 3000 shares. She sold 2100 of the shares on August 4, 1978, and the remaining 900 shares on June 13, 1979.

Her suit complained of the purchase of 335 shares. The significance of her trade dates is made plain by the following chronology of events:

1. LTV's 1974 year–end earnings were announced on February 17, 1975. The 1974 earnings figures were $111,692,000, the then highest in LTV's history. The restatement of earnings issued on October 13, 1978 had

the effect of increasing these earnings to $114,397,000 or an increment of $2,705,000.

2. LTV's 1975 first quarter earnings were announced on April 28, 1975 and showed earnings of $19,800,000 for the quarter. These figures were not audited and were not later restated.

3. LTV's 1975 second quarter earnings were announced on July 24, 1975, three days after the date on which plaintiff Feldman alleges she purchased LTV common stock.

4. LTV issued no other earnings reports between the 1974 year–end figures and the 1975 second quarter report.

She filed her suit on December 11, 1979, over one year after LTV's restatement of earnings had been announced and three weeks after plaintiffs in MDL 371 had filed their joint class action motion, naming only LTV Corporation as the defendant. Otherwise her complaint tracked the other complaints. *See* n.1, *supra.* Her motion for class certification was not filed until February 21, 1980, the day after defendants filed their responding class brief. Feldman in her complaint sought a class for the same class period except her proffered class would have begun three days earlier. That is, her complaint was little more than a tracking of what had long before been alleged (and briefed at length). In June of 1979 not long after her husband had contacted her present counsel, Mrs. Feldman threw her LTV file away.

Defendants argue that Mrs. Feldman is an inadequate class representative for the reason that she had revealed her lack of diligence and attentiveness to this suit by the untimeliness of her claim; that she is peculiarly vulnerable to the defense that she did not rely upon any statements of LTV because she threw away the papers which might have shed light on the question and because she purchased in 1975 only because she already had made a substantial purchase in 1974; that she simply rounded out her earlier purpose from approximately 2,700 to 3000 shares.

In the proper context such peculiar vulnerability to the defense of lack of reliance can make a claim atypical. Defendants point to this court's opinion in *In re Commonwealth Oil/Tesoro Petroleum Securities Litigation*, 484 F.Supp. 253 (W.D.Tex.1979) in which the court declined to certify a proffered class representative for among other reasons that she was peculiarly vulnerable to a defense of no reliance. Relying in part upon the reasoning of *Greenspan v. Brassler*, 78 F.R.D. 130 (S.D.N.Y. 1978) and *Koos v. First National Bank of Peoria*, 496 F.2d 1162 (7th Cir. 1974), the court found that there was a "... special and obvious obstacle to proof of reliance by the class representatives." *Id.* at 263. But the *Tesoro* decision was not bottomed solely upon the reliance issue. Indeed, the fatal weakness was a finding of inadequacy of counsel–by virtue of a lack of interest in the case as well as potential conflicts of interests posed by prior representation of a defendant. None of these factors are present here.

In *Tesoro*, significantly, the class at issue (there were others certified) could not travel on a "fraud on the market" theory because it was a tender offer purchase with the issuer setting the price. That is not to say, and *Tesoro* did not hold that a "fraud on the market" theory was never applicable to a tender offer. No effort was there made to maintain a theory of "market pollution" with a proved tie between the tender price and the market. *Tesoro* is inapposite.

Here the combined force of materiality as defined by *Affiliated Ute Citizens v. United States, supra,* and the presumed reliance of the "fraud on the market" theory render defendants' task of demonstrating a lack of reliance a difficult one. And procedurally, the question would be determined after the trial of the common questions. Despite this burden, defendants have raised substantial questions. There is a strong inference from the record that the July 1978 purchase, here sued upon, was to round out the 1974 purchase (by conversion of debentures). Of course, Mrs. Feldman cannot travel here on the 1974 purchase and there is little to

counter the inference that she did not rely upon the market. The question is close. If it were her only difficulty, defendant might not succeed; but it is not.

The additional problem, and it is on this record substantial, is that she appears to be simply jumping aboard earlier filed and well developed claims. In fairness, this lateness ought not be charged to her counsel who appears to be most competent in this field, but it ought to be charged to her own lack of interest. Of course, the attorney carries the fight in these suits and there is a bit of hypocrisy to the extent we pretend otherwise. But heavy dependence upon counsel is not the same as failure to act at all. The long wait to file suit–long after the news was widely known–and after others had laid the groundwork has a ring of bandwagon jumping.

Finally, the late complaint of Feldman added little to what was there. She is just too late with too little. Simply put, when the team is already seven deep in one's position, one ought not be late to spring training. This is not to make light of her effort. Rejecting this effort serves the policy of orderly management of this type of litigation and discourages bandwagons–at least late boarding.

5. *Abraham Fruchthandler*: The sole attack upon Fruchthandler's proffered status as a class representative is that he was an "in and out" trader. That argument fails for the reasons otherwise stated in this opinion. He is represented by able counsel and no reason now appears why he should be found to be other than an adequate representative.

In a final broadside at all, defendants argue that no plaintiff may represent class members who purchased LTV securities after the plaintiff did. The argument is that representation of persons who purchased at later dates present inevitable conflicts in the assertions of the materiality of repre-

sentations made in their effect upon the market. The argument is that the class representative's incentive would be to accentuate the impact of misstatements made at or near the class representative's purchase to the disadvantage of the impact of misstatements or omission at later times. This argument has been dealt with at least in part, if not in its entirety, in the court's earlier analysis. It is doubtful that in any open market fraud case extending beyond a matter of months whether the fit between the class representative's claim and the class member's claim is ever perfect. That observation, although not a decisional pivot, is important to the context of the defendants' argument. That is, if defendants' argument be well taken there could be few, if any at all, classes certified in the market fraud context.

As otherwise made plain in this order, the class cannot be maintained absent an acceptance of an out–of–pocket damages theory. The prosecution of this case upon an out–of–pocket theory places upon the plaintiffs the burden of proving the common scheme as alleged, with the requisite scienter, and the further task of identifying that part of the resulting market price through the class period tainted by the conduct found to be illegal. Defining the width of this "ribbon of fault" through the class period as it follows the ups and downs of market activity within the traded securities can be done only by sophisticated techniques of market analyses. This method of proof reduces to one of remoteness [9] the opportunity for any class representative to feather their own nest.

**9.** *See, e. g., The Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities, supra.* There has been much research on the efficient market hypothesis and portfolio theory in the six years since the note was published, possibly affecting the validity of the method there proposed. Thus the court cites the note only to illustrate the availability of techniques to determine the actual value of securities absent effects of fraud, and not as endorsement of the particular method proposed, which may be methodologically flawed.