Theresa M. **MOTTOROS**, Plaintiff,

v.

Martin **ABRAMS**, et al., Defendants.

No. 80 C 4778.

United States District Court,
N. D. Illinois, E. D.

Oct. 15, 1981.

Jules Brody, Stull, Stull & Brody, New York City, Arthur T. Susman, Prins, Flamm & Susman, Ltd., Chicago, Ill., for plaintiff.

Stuart Fischman, Moses & Singer, New York City, Harvey J. Barnett, Barnett & Beigel, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

This cause comes before the court on motion of the plaintiff for class certification. Fed.R.Civ.P. 23. The class sought to be certified is defined as

All persons, exclusive of the defendants, who purchased the common stock of AES Technology Systems, Inc., on the Over-the-Counter Market between March 13, 1979, and September 5, 1980.

The complaint alleges violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (§ 10(b)).

## FACTS

Plaintiff is an investor who purchased shares of stock in AES Technology Systems, Inc. Defendants are AES Technology, its subsidiary, Game Plan, Inc., which is engaged in the manufacture of slot and pinball machines, and the officers and directors of those corporations. Plaintiff alleges that on March 13, 1979, defendants issued a press release in which they claimed to have received their first orders for coin operated slot machines from two hotel/casinos in Las Vegas; one order was claimed to be for 72 machines to the Sands Hotel, another was for 50 machines to the Dunes Hotel. The release also stated that the Sands had agreed to buy a substantial number of additional machines from AES. This press release failed to state that this order for 72 machines was not an "order" but was rather an agreement for the purchase of three machines with 69 machines to follow if the first three proved satisfactory. (Defendants later failed to disclose that the Sands never exercised this option to purchase the additional machines.) This release also failed to state that the commitment from the Dunes was not a "firm" order, and that on March 5, 1979, AES had granted an option to a Dunes' subsidiary, M & R Investment Corporation, to purchase shares of AES stock. Defendants again failed to disclose the existence of this stock option in their press release of March 29, 1979, in which AES stated that the Dunes had placed an order for more than 200 machines for its Atlantic City casino. Obviously, disclosure of the stock option might have undercut the significance of the large order from the Dunes as an indication of the desirability of the machines produced by AES. Prior to these press releases, AES stock had been lightly traded at approximately $7\frac{3}{4}$ per share. On March 30, 1979, plaintiff Mottoros, having seen these two press releases, purchased 200 shares of AES stock at a price of $13\frac{3}{4}$ per share.

On June 21, 1979, AES issued a press release stating it had been field testing new machines at three locations in Las Vegas and had received orders from more than a dozen casinos in Nevada. Plaintiff again alleges a failure to disclose that certain of these orders were not firm but were contingent or conditional upon testing of a small number of machines, and that again the Dunes' option was not disclosed.

On July 29, 1979, a column written by Dan Dorfman was published in the Chicago Tribune and other newspapers. Although we have not seen a copy, it appears that the column disclosed and commented negatively upon the Dunes' options and the business of AES. On July 30, 1979, AES issued a press release in reply. Among other things, the defendants stated in this press release that AES' pinball machine sales had gone from $–0– to $5 million during its first year and that it had "commitments" for more than 1,000 slot machines. Plaintiff alleges that AES' books at the time showed sales of only $4,371,000.00. On December 4, 1979, AES filed its form 10–K with the Securities and

Exchange Commission. The financial statement attached to the form revealed that certain sales previously recorded as having been made had not been made; therefore, the amounts of these sales were deducted and first year sales (for the fiscal year ending June 30, 1979) ultimately totalled only $3,763,000.00. The allegedly misleading press release of July 30, 1979, was also attached as part of the 10–K filing.

On April 2, 1980, AES issued a press release stating that it had sustained substantial losses due to the fact that some of its orders had been contingent, that it had been unable to collect receivables, and that it was seeking debt or equity financing.

On September 5, 1980, the SEC issued an order (Release No. 17126) finding probable cause to believe that AES had conducted its business in violation of the securities laws, and accepting an Offer of Settlement from AES. This SEC release detailed all the activities complained of by the plaintiffs in this case. After the release, AES shares declined to approximately $4 per share.

Plaintiff has filed this suit on behalf of the class pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, to enforce liabilities created by Section 10(b) of the Act (15 U.S.C. § 78j) and Rule 10b–5 of the SEC (17 CFR § 240.10b–5).

Defendants raise two points in opposition to this motion for class certification.[1] First, they argue that there is no "common question of law or fact" predominating among the class members, since the plaintiffs are required to prove reliance as to each and every class member individually. Second, defendants argue that the closing date for the class should not be as late as September 5, 1980, when the SEC published Release No. 17126 and found that there was reason to believe that AES was substantially in violation of the securities laws. Rather, defendants argue that the closing date for the class should be, at the latest, April 2, 1980, when defendants issued the "corrective" press release that allegedly "cured" all previous misstatements and omissions. Neither argument has merit, and we therefore grant the motion and certify the class as defined above.

*DISCUSSION*

*1. Reliance*

We note at the outset that plaintiff has pleaded and indicates that she will prove reliance as to her own personal claim. Therefore, were we to hold that reliance is a necessary element of this action we would still find that this plaintiff is an adequate class representative. We also note that even if every single class member had to prove his or her reliance, that fact would not preclude certification of the class. "[T]he mere existence of individual questions of reliance is not sufficient to warrant a ruling that common questions of law or fact do not predominate." *Ramsey v. Arata*, 406 F.Supp. 435, 441 (N.D.Texas 1975), *disapproved on other grounds, Wood v. Combustion Engineers, Inc.*, 643 F.2d 339 (5th Cir. 1981). *See also Rifkin v. Crow*, 80 F.R.D. 285, 286 (N.D.Tex.1978) (on remand); *Sargent v. Genesco, Inc.*, 75 F.R.D. 79, 85 (M.D.Fla.1977). Certainly the class action mechanism would still be preferable for adjudicating common questions regarding defendants' conduct and any liability that would attach to such conduct. The reliance and entitlement of individual investors to any damage award could be referred to a special master. *See In re LTV Securities Litigation*, 88 F.R.D. 134, 143 n.4 (N.D.Tex. 1980).

We now turn to the question of whether reliance is a required element of proof for the plaintiff. The extent to which reliance

---

1. Defendants have previously contested the adequacy of the class representatives. In a hearing on June 22, 1981, we found that the named plaintiffs in a related case, *Schacter v. AES Technology Systems, Inc.*, No. 80 C 5428, were not adequate class representatives, but that Theresa Mottoros is an adequate class representative. We also find now that the class is sufficiently numerous to satisfy the requirements of Fed.R.Civ. P. 23. Defendant does not now contest either the adequacy of Ms. Mottoros as a representative or the numerosity of the class; defendants contest only whether the class meets the commonality requirement and whether this case would be more easily tried as a class action.

258

is an element of a 10b–5 action is an issue currently being debated in the federal courts, especially in the Fifth and Ninth Circuits. The United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), held that individual reliance need not be proven where the plaintiff's 10b–5 claim is based upon fraudulent, material nondisclosure by the defendants. Upon proof of the materiality of the nondisclosure, reliance becomes a rebuttable presumption in favor of the plaintiff. *See Rifkin v. Crow*, 574 F.2d 256, 263 (5th Cir. 1978). *Ute* has been interpreted to apply only to non-disclosure claims; individual reliance has remained an element of 10b–5 claims for active, material misrepresentations. *Sargent v. Genesco, Inc.*, 75 F.R.D. 79, 84 (M.D.Fla.1977). *See also Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir. 1973); *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. 1278 (N.D.Ill. 1981).

██ As in so many securities cases, *see, e. g., Sargent v. Genesco, Inc.*, 75 F.R.D. at 84, the claims of plaintiff Mottoros are basically hybrid in nature. They are neither wholly misrepresentations, nor wholly omissions. "[W]hen confronted with this occurrence, the Court should not construe the remedies provided by the Securities Exchange Act technically and restrictively, but flexibly to effectuate its remedial purpose of achieving a high standard of integrity in the securities industry." *Ibid.* Thus, in such cases— and in many cases where the claim is based solely upon material misrepresentations— many courts have been examining a new theory of proof which more accurately reflects the true nature of transactions in the stock market. This is the "fraud upon the market" theory, which plaintiff in this case wishes to utilize in proving her suit.[2] To prevail upon this theory, plaintiff must demonstrate that defendants' misrepresentations and omissions were part of a common scheme, or a continuing course of con-

duct (*see Ute*, 406 U.S. at 153, 92 S.Ct. at 1472) to manipulate the value of the stock, and that defendants' fraudulent activities caused an artificial inflation of the market value. The plaintiff need not prove individual reliance upon the particular misrepresentations or omissions of defendants, but only that the facts misrepresented or omitted were material, and that plaintiff relied upon the integrity of the market price of the security which was distorted by the impact of the particular misstatements or omissions. *See In re LTV Securities Litigation*, 88 F.R.D. 134, 142 (N.D.Tex.1980). *See also Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981); *Rifkin v. Crow*, 574 F.2d 256 (5th Cir. 1978); *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). Reliance is presumed—and may be rebutted— once plaintiff makes this showing.

*Blackie v. Barrack* is the first case, and the leading one, to discuss this theory in depth. As do the cases which follow it, *Blackie* analyzes the rationale for the "fraud upon the market theory" in terms of the causal relationship between the defendants' misconduct and the plaintiff's injury.

Proof of reliance is adduced to demonstrate the causal connection between the defendant's wrongdoing and the plaintiff's loss. We think causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance. Materiality establishes the reliance of some market trades and hence the inflation in the stock price—when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case.

\* \* \* \* \* \*

A purchaser on the stock exchanges . . . relies generally on the supposition that the market price is validly set and that no

There appears to be no case reported in this circuit which applies the "fraud upon the market" theory. In *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. 1278 (N.D.Ill.1981) (two opinions),

Judge Aspen discusses proof of a common scheme or continuous course of conduct, but apparently not in the context of this theory. *See* p. 261 *infra.*

unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price—whether he is aware of it or not, the price he pays reflects material misrepresentations. Requiring direct proof from each purchaser that he relied on a particular representation would defeat recovery by those whose reliance was indirect, despite the fact that the causational chain is broken only if the purchaser would have purchased the stock even had he known of the misrepresentations.

524 F.2d at 906–07. *See also Shores v. Sklar*, 647 F.2d at 469; *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380–81 (2nd Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 531 (1975). We agree with Judge Higgenbotham in *LTV Securities Litigation* that "reliance on the market price is conceptually indistinguishable from reliance upon representations made in face-to-face transactions." 88 F.R.D. at 142.

In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus, the market is performing a substantial part of the evaluation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

\* \* \* \* \* \*

Recent economic studies tend to buttress empirically the central assumption of the fraud on the market theory—that the market price reflects all representations concerning the stock . . . . The fraud on the market theory does not eliminate the element of reliance but places it where in open market transactions it belongs—connecting the purchaser to the market, not the specific misstatement.

88 F.R.D. at 143–44.

Thus, in such a case there is no need for plaintiff or plaintiff class to prove the individual reliance of each class member upon the defendants' misstatements. Where, as here, the plaintiff alleges the existence of a course of conduct designed to artificially affect the price of the stock, the plaintiff's burden is satisfied by proving the existence of the scheme itself, the materiality of the misstatements and omissions, and some level of scienter on the part of the defendants. The burden then shifts to the defendants to rebut the presumption of reliance. One way of rebutting this presumption is to show that the investor did not rely upon the market when making his decision to purchase or sell, but rather relied upon matters extraneous to the market. *In re LTV Securities Litigation*, 88 F.R.D. at 144.[3] Other ways of rebutting the presumption of reliance are similar to those found in regular "omission" cases, where reliance is also presumed: the defendant may show that an investor would have purchased the stock even if the investor had known of the misstatements or omissions. *See Rifkin v. Crow*, 574 F.2d at 263; *Blackie*, 524 F.2d at 907. The argument presented by the defendants in the case at bar— that the price of AES stock was not affected by their conduct but rather by the fact that stocks in gambling industries fluctuated wildly during the period of time in question—is a defense that goes not to the reliance aspect of this case but to the materi-

---

3. However, the court in *LTV* also notes, 88 F.R.D. at 145, that the "rugged investor" who relies not on the "market" but on his own assessment of the specific misrepresentation is nonetheless ". . . doing so upon an assessment of the translation of the value of the representation expressed in the market. That is because the ultimate reliance is still upon the market's pricing of information." Another rea- son this might be an inadequate defense is that by showing the individual relied not on the market but his own assessment of the released information, the defendants would necessarily concede direct reliance by that investor upon the alleged misstatements or omissions. Such reliance, of course, is a wholly separate but equally valid basis for relief.

ality of the defendants' alleged misrepresentations and omissions.

■ We therefore see no substantive bar to the certification of this case as a class action, whether plaintiff ultimately proceeds on a fraud upon the market theory or instead upon more traditional "fraudulent misstatements" or "omissions" theories in order to prove her case and the case for the class.

### 2. Date of Termination of the Class

■ Plaintiff seeks to have the class include all purchasers of AES stock between March 13, 1979, and September 5, 1980. The September 5 date is the date upon which the SEC issued its findings of a probable violation of the securities laws by AES and accepted an Offer of Settlement from the defendants. Defendants do not argue with the March 13, 1979, date, but argue that the September 5, 1980, date is too late and would result in too large a class. Defendants assert that the class should be closed as of April 2, 1980, or earlier since defendants issued a "corrective" press release on that date. They also point out that there had been other information of a similar tenor available to investors prior to September 5, 1980.

We find defendants' arguments unpersuasive. First, there is a reasonable argument that the April 2, 1980, press release was insufficient to correct the alleged misstatements and omissions of the prior press releases and financial statements released by the defendants. It is vague and limited in contrast to the specificity of the earlier information released. It failed to reveal

which orders for slot machines had been contingent and what the true financial state of the company was. At most, the release can be said to have revealed that "some of the orders were conditional or contingent in nature," without disclosing that the bulk of the orders were of this character.[4]

Second, defendants also rely upon the fact that on July 29, 1979, information regarding the alleged stock options given to the Dunes appeared in the Chicago Tribune and other newspapers in a column by Dan Dorfman. Defendants have not provided us with a copy of this column, and we therefore have no informed opinion as to its materiality or probable effect on the market place.[5] However, even if the column contained all information necessary to correct defendants' alleged misrepresentations, it would be inappropriate for us to use that as the basis for limiting the class at this time. The effect of the disclosures in the column will still be largely a question of fact to be determined at trial. It is not the kind of fact to be decided by the court on a motion for class certification.

We also reject defendants' convoluted argument regarding the 10–K financial statement filed on December 5, 1979. Although the financial statement contained in the 10–K may have been accurate with regard to AES' 1979 reported machine sales, plaintiff alleges that it reaffirmed the false and misleading press releases which overstated pinball machine sales by over $1.2 million.

■ Finally, and most importantly, we emphasize that in pleading and proving a violation of 10b–5 by means of a "fraud

---

4. If plaintiff ultimately must fall back upon proving a traditional "misstatement" case, rather than her proposed "fraud upon the market" theory, we would consider cutting off claims for the misstatement about the conditional nature of the orders as of April 2, 1980. This could be accomplished by amending the class definition at that time. Meanwhile, since it appears that plaintiff intends to prove a "common scheme" or "course of conduct" on the part of the defendants, we conclude that the September 5, 1980, date is the most appropriate for terminating the class. We emphasize that whether or not this press release was real-

ly "corrective" is in any event a factual question to be resolved at a later date in this case.

5. As discussed in note 4, supra, if plaintiff ultimately must fall back upon proving a traditional "omission" case, rather than her proposed "fraud upon the market" theory, we would consider cutting off claims for the omission of information regarding the stock options given to the Dunes as of the date of the Dorfman article. (It is our understanding that these stock options were the subject matter of the article.)

upon the market" theory, plaintiff relies upon not two or three instances of discrete misstatements or omissions, one or two of which may have been "corrected," but rather seeks to show that the defendants' conduct as a whole had a fraudulent and inflationary effect upon the market. This proof may even include ineffectual attempts at corrections. In this case, plaintiffs have alleged the issuance of several misleading press releases and fraudulent financial forms. Defendants can only point to a vague "corrective" press release and some other information in the newspaper. It would be premature—in fact, procedurally bizarre—to hold at this stage of the case that these "corrective" events eliminated the effects of defendants' prior actions and limit the class to whom defendants may be liable. For present purposes, it makes sense to include in the class all persons who bought stock prior to the SEC order of September 5, 1980.

The motion is granted and the class as defined on p. 256 *supra* is certified.