Edward A. ANDERSON, et
al., Plaintiffs,

v.

BANK OF THE SOUTH, N.A., et
al., Defendants.

No. 85–1222–CIV–ORL–18.

United States District Court,
M.D. Florida,
Orlando Division.

Nov. 16, 1987.

Richard H. Adams, Robert W. Anthony, Smathers, Pleus, Adams, Fassett & Divine, Orlando, Fla., and Nicholas E. Chimicles, R. Bruce McNew, Haverford, Pa., R. Alan Stotsenburg, P.C., New York City, Elmo R. Hoffman, Parker, Johnson, Owen & McGuire, Orlando, Fla., for plaintiffs.

Robert L. Young, Carlton, Fields, Ward, Emmanuel, Smith, Cutler, Orlando, Fla., and Richard R. Cheatham, Jerre B. Swann, Debbie W. Harden, Stephen E. Hudson, Kilpatrick & Cody, Atlanta, Ga., for Bank of the South, NA.

M. Timothy Elder, William G. Leonard, Thomas S. Richey, John T. Marshall, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., and G. Yates Rumbley, Pitts, Eubanks, Hannah, Hillyard & Marsee, Orlando, Fla., for Arnall, Golden and Gregory.

Carey P. DeDeyn, John A. Chandler, Sutherland, Asbill & Brennan, Atlanta, Ga., and H. Terrell Griffin, Griffin, Morgan, Linder, Townsend & Adler, P.A., Orlando, Fla., for Parker, Hudson, Rainer Dobbs & Kelly.

W. Donald Cox, John McQuigg, Fowler, White, Gillen, Boggs, Villareal and Banker, P.A., Tampa, Fla., for Hurt, Richardson, Garner, Todd and Cadenhead.

Robert W. Beynart, John L. Latham, Edward C. Brewer, III, Smith, Gambrell & Russell, Atlanta, Ga., and John W. Foster, Smith & Schnacke, P.A., Orlando, Fla., for Swink & Co.

Herbert P. Schlanger, Atlanta, Ga., for Foundation Investors, Inc. and J.B. Developments, Ltd.

W.L. Kirk, Jr., Michael R. Levin, Rumberger, Kirk, Caldwell, Cabaniss, & Burke, Orlando, Fla., for Dunn, Smith, Withers and Hart.

John W. Frazier, IV, John E. Caruso, Montgomery, McCracken, Walker, & Rhoads, Philadelphia, Pa., and J. Thomas Cardwell, Akerman, Senterfitt & Eidson, Orlando, Fla., and Rodman W. Benedict, Associate General Counsel, New York City, for Price Waterhouse.

Jerry R. Linscott, William L. Pence, Baker & Hostetler, Orlando, Fla., for Albert D. Godwin, H. Van Massey and Benjamin H. Rawls.

T. Douglas Wilson, Jr., William J. Cobb, Kocher, Wilson, Korschun & Cobb, Atlanta, Ga., and Maura T. Smith, Smith, Mackinnon, Mathews & Harris, Orlando, Fla., for Hereth, Orr & Jones, Inc., and Finerock Corp.

## MEMORANDUM OPINION

GEORGE KENDALL SHARP,
District Judge.

This case is before the court upon plaintiffs' motion for certification of a plaintiff class. In aid of possible settlement, and to give the parties the court's thoughts regarding both the difficult facts and issues in this case, this memorandum opinion is rendered.

In their amended complaint, plaintiffs seek damages under, § 5, § 12 and § 17(a) of the Securities Act of 1933 ('33 Act), 15 U.S.C. §§ 77e, 77l and 77q(a), § 10(b) of the Securities Exchange Act of 1934 ('34 Act), 15 U.S.C. § 78j(b), Rule 10b–5, 17 CFR § 240.10b–5, and various Florida statutory and common law theories. Plaintiffs seek certification as class representatives of a plaintiff class of purchasers of the Volusia County (Florida) Health Facilities Authority First Mortgage Health Care Facilities Revenue Bonds (The Bishops Glen Foundation, Inc. Project) Series 1983 (the Bonds) from the date of issuance until the Bishops Glen Foundation, Inc. (Bishops Glen) filed for reorganization on December 28, 1984.

The court is aware that it must not consider the merits of the plaintiffs' case in deciding the class certification issue. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1974); *Huff v. Cass*, 485 F.2d 710, 712 (5th Cir.1973); *A & J Deutscher Family Fund v. Bullard*, 1986 Fed.Sec.L.Rep. (CCH) ¶ 92,938 at 99,582 (C.D.Cal.1986) [available on WESTLAW, 1986 WL 14903]; *Stoller v. Baldwin United Corp.*, 1985 Fed.Sec.L. Rep. ¶ 92,298 at 92,020 (S.D.Ohio 1985) [available on WESTLAW, 1985 WL 5809]. Nevertheless, the class certification issue generally involves considerations that are "enmeshed in the factual and legal issues comprising the plaintiff's cause of action. ..." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed. 2d 351 (1978) (citing *Mercantile Nat. Bank at Dallas v. Langdeau*, 371 U.S. 555, 558, 83 S.Ct. 520, 522, 9 L.Ed.2d 523 (1963)). It is necessary to analyze the plaintiffs' factual allegations, the record evidence pertinent to class action issues, and the applicable law in order to understand and evaluate the propriety of the class action device in this case.

## STATEMENT OF FACTS

The Bonds were issued and sold pursuant to, *inter alia*, an Official Statement dated September 29, 1983, a Preliminary Official Statement dated September 9, 1983, and a summary dealer memorandum dated August 1, 1983, which plaintiff collectively labels the Official Statement (OS). The proceeds from Bond sales were to be used, *inter alia*, to acquire, construct and equip the Bishops Glen Project (Project), a "life care facility." Bishops Glen was organized as a Florida not-for-profit corporation in November, 1982.

The Project, which consisted of 300 residential units and sixty skilled nursing beds for the unit residents, was to be marketed to financially qualified people 62 and older, who would pay a one-time entrance fee and a monthly service fee. As of April, 1986, there were 3,776 Bishops Glen bondholders, who were residents of forty-eight states and five foreign countries. Just over one-half of these bondholders have Florida addresses. A significant number of Bishops

Glen bondholders also purchased bonds for the Royal Regency project discussed *infra*.

In their complaint, plaintiffs allege that defendants knew many material facts which they failed to disclose in the OS. According to plaintiffs, the defendants in this action all were involved in the issuance of the Bonds as professionals, principals or underwriters. The successful marketing of the Project by J.B. Development, Ltd. (the Developer) was identified in the OS as a crucial factor affecting the ability of Bishops Glen to meet its obligations, including debt service on the Bonds. Plaintiff's allege that defendants knew or recklessly disregarded numerous facts demonstrating the Developer's inability to successfully market the Project and raising substantial doubts regarding the financial viability of the Project. Specifically, plaintiffs contend that defendants knowingly or recklessly failed to disclose in the OS that the Royal Regency of Winter Haven life care facility (Royal Regency Project), in which many of the entities participating in the Bishops Glen Project also were involved, was a "disaster," in part because of the inability of some defendants to perform their marketing and construction obligations. Plaintiffs claim that the OS failed to disclose many of the problems with the Royal Regency Project and minimized other problems, characterizing them as caused by other, unrelated entities. Plaintiffs also allege that defendants inadequately investigated or recklessly failed to investigate the performance of those associated with Royal Regency because of the substantial relationship between the parties associated with the Bishops Glen and Royal Regency Projects.

Plaintiffs allege that defendants entered into a combination, conspiracy or course of conduct which, by their knowing or reckless omissions or misrepresentations, distorted the truth and misled plaintiffs in order to cause the issuance of the Bonds and to sell them at an artificial and excessive price. Plaintiffs appear to allege that absent the defendants' combination, conspiracy or course of conduct to create an OS which was misleading because of omissions and misrepresentations, the tax-ex-empt financing for the Project and the issuance of the Bonds could not have occurred. Plaintiffs claim that the Developer manipulated the termination of its relationship with Royal Regency to avoid disclosure to plaintiffs of the problems with Royal Regency. Moreover, they allege that Bank South made a $716,000 payment prematurely, improperly and in contravention of its fiduciary obligations to Finerock Corporation. Finally, plaintiffs also allege that in the OS defendants misrepresented that the Bonds were Industrial Revenue Bonds exempt from registration under § 5 of the '33' Act.

Approximately fifteen months elapsed between issuance of the Bonds and the filing for reorganization by Bishops Glen. In that interval, a number of events occurred which are pertinent to defendants' arguments on the class certification issue. According to Robert Sheddy, a Swink vice president in charge of underwriting, the Bishops Glen Bond distribution was unusual relative to other life and health care issues because sales from the Swink inventory for the initial offering extended over several months. In contrast, the Royal Regency Project issue sold out within less than one week. Sheddy commented in general that health care bonds usually are sold by brokers and dealers who contact customers by telephone, although in other instances brokers are called by customers who have seen that a particular bond is available or want to know what is available. The customers' discussions with brokers vary from firm to firm and broker to broker. However, according to Sheddy, few customers ask for a copy of the Official Statement before ordering bonds, although the applicable regulations require that a copy of the Official Statement be delivered no later than the settlement date. During the pertinent period, the Bishops Glen bonds also were traded on the secondary market. With respect to secondary market sales, Sheddy stated that brokers usually furnish copies of the Official Statement only on request.

Around the time the statements which constitute the OS were issued, a *Forbes*

magazine article, reprinted in *The Lakeland (Fla.) Ledger*, discussed problems in the life care facilities industry. Rudnitsky & Konrad, *Trouble in the Elysian*, Forbes, Aug. 29, 1983, at 58–59, *reprinted in The Lakeland (Fla.) Ledger*, Sept. 11, 1983, at 1A. The *Forbes* article devoted two paragraphs to the Royal Regency Project, and mentioned that only 10% of its units had been sold ten months after it was financed. The *Ledger* companion article to the *Forbes* article reprint focused on the Royal Regency project, and also indicated that the project was behind on original projections, which officials attributed to marketing problems and construction delays. Satterfield, *Polk hoping area projects bear fruit, The Lakeland (Fla.) Ledger*, Sept. 11, 1983 at 1B.

Anderson ordered his Bonds on September 9, 1983, the date of the Preliminary Official Statement. Heald made his first Bishops Glen Bond purchase on October 28, 1983, for himself and his wife as joint tenants. On November 7, 1983, Hamel made his first Bishops Glen Bond purchase, which was for himself and his daughter as joint tenants.

In a mid-November, 1983 press release, Royal Regency indicated that the marketing of units was "substantially below" projections and that reorganization proceedings were being considered, and this release was reported in the *Ledger*, the *Winter Haven (Fla.) New Chief*, and the *Bond Buyer*, which is, according to Sheddy, a national bond trading publication that provides information for the bond market on matters affecting the matter, price, risk and security of bond issues. The *Winter Haven (Fla.) News Chief*, Nov. 22, 1983, at 1A; Schneider & Satterfield, *Royal Regency eyes bankruptcy option, The Lakeland (Fla.) Ledger*, Nov. 23, 1983, at 1B; Yacik, *Fla. Health Unit May Seek Bankruptcy Protection, The Bond Buyer*, Nov. 28, 1983, at 1.

According to Sloan Gibson, a Bank South senior vice president, Bank South declared a default on the Royal Regency bonds on December 12, 1983. Bank South notified Royal Regency bondholders of the default in three separate notices, the last dated January 6, 1984. The second notice highlighted the lack of success in marketing the Royal Regency project. Defendant Herreth, Orr & Jones (HOJ), the managing underwriter of both the Bishops Glen and Royal Regency projects, suspended retail trading on December 16, 1983, after failing a capital adequacy test, and, thereafter, liquidated its assets. On March 8–9, 1984, a Royal Regency bondholder and a Florida securities firm that sold Royal Regency bonds filed separate suits against the Royal Regency developer, its principals, HOJ, and others.

Not surprisingly, these events were reported extensively in Florida and Atlanta papers as well as the *Bond Buyer*. (Doc. 104, Ex. A–11 to A–27). A *Forbes* article reported the Royal Regency default and the closing of HOJ, and in an *Atlanta Journal* article, Herreth of HOJ said that the Royal Regency developer (Jones) "didn't get the job done." *The old folk's home, Forbes*, Jan. 16, 1984 at 13; Mantius, *Herreth, Orr & Jones folding, Atlanta Journal*, Jan. 22, 1984, at 1E.

Meanwhile, plaintiff Keogh purchased her Bishops Glen Bonds on December 20, 1983. Heald and his wife made their second purchase of Bishops Glen Bonds on January 18, 1984, and January 20, 1984. On January 19, 1984, McCarthy also purchased Bishops Glen bonds for himself and his wife as joint tenants. Finally, Hamel made three additional bond purchases for his wife and his daughter as joint tenants on April 13, 17 and 19, 1984. Except for Hamel, all of the named plaintiffs purchased their Bishop Glen Bonds from brokers at J. Milton Newton, Inc. (Newton), the Florida securities firm which filed suit over the Royal Regency project on March 9, 1984. All of the named plaintiffs purchased their bonds at or near par, except that Hamel's second purchase was at 93% of par.

Plaintiff Betty Keogh, a financial secretary with a high school education and limited stock and bond investment experience, did not read the OS until after her purchase, and then "skimmed" it and saw

nothing to cause her concern about her Bishops Glen Bond purchase. Keogh could not remember her Newton broker's specific statements, but acknowledged that she decided to make the bond purchase based upon his comments, which apparently were rather general. Dr. Edward Anderson, a retired doctor who specialized in aerospace medicine, bought from the same Newton broker as Mrs. Keogh. He also did not read the OS before he purchased; in fact, his purchase was made before the September 29, 1983, Official Statement was available. Dr. Anderson, who had limited prior experience purchasing bonds, received an OS in December, 1983, at which time he "thumbed through it." According to Dr. Anderson, his broker made general statements to him about the Bishops Glen Bonds and the interest rate paid on them, but did not tell him that the Bishops Glen Bonds involved substantial risk. Plaintiff Frank McCarthy, a retired businessman with no previous investment experience, also purchased the Bishops Glen Bonds before receiving the OS. He glanced at the OS for five to ten minutes when he received it two or two and a half weeks after his trade. In purchasing the Bonds, McCarthy relied on his broker's statements as to the rate of interest and the tax-free nature of the bonds, and also the fact that Bishops Glen was a local project. McCarthy admitted that his Newton broker told him that the Bishops Glen bonds involved a substantial risk and were speculative in nature.

Plaintiff Benjamin Heald, who had more extensive bond investment experience including two earlier purchases of health facility bonds, did not recall if he received the OS before his first Bishops Glen bond purchase. However, it was his practice to receive the OS before purchasing bonds, and he believes he "looked through" the OS before his first purchase.

Plaintiff Charles Hamel, a retired businessman and real estate investor with no prior experience in the tax-exempt bond market, visited the Bishop Glen office and site and reviewed the OS before his first Bishops Glen Bond purchase in late October, 1983. In making the first trade, Hamel relied on the OS and on his personal investigation of the construction and marketing effort. Before the April purchases he made on behalf of his wife and daughter, Hamel visited the construction site on approximately a monthly basis, and checked on the sales progress about three times. Hamel realized that sales were "slightly behind" the projections in the OS, but he purchased the Bonds anyway because Bishop assured him the sales problem would be corrected. Bishop, whom Hamel regarded as the developer, told Hamel that the sales problems were attributable to the real estate company in charge of sales, and that a new company was being hired. Hamel testified that he would not have made his second purchase of Bishops Glen Bonds if "I didn't think that the reason was a legitimate reason and I felt that I had a reason to rely on the increase of sales ...." (Hamel Depo. at 102, Vol. I, June 3, 1986).

## CONCLUSIONS OF LAW

### I. General Class Action Principles

The requirements for maintenance of a class action are set forth in Federal Rule of Civil Procedure 23. "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. at 178, 94 S.Ct. at 2153 (quoting *Miller v. Mackey International*, 452 F.2d 424, 427 (5th Cir.1971)). The burden of proving that class certification is proper rests with the party seeking certification. *See Ezell v. Mobile Housing Board*, 709 F.2d 1376, 1380 (11th Cir.1983).

Rule 23(a) sets forth the prerequisites to all federal class actions:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the represent-

ative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P.23(a); *see, e.g., Kennedy v. Tallant,* 710 F.2d 711 (11th Cir.1983). In this class action under Rule 23(b)(3), the court also must find as to both the plaintiff and defendant classes that:

> ... the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Although mindful that securities actions are considered particularly appropriate for class action treatment, the court nevertheless must subject the motion for class action certification to rigorous scrutiny to insure that the requirements of Rule 23 have been satisfied. *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *see, e.g., Ross v. BankSouth, N.A.,* 1986 Fed.Sec.L.Rep. (CCH) ¶ 92,526 at 93,151 (N.D.Ala.1986) [available on WESTLAW, 1986 WL 2702], *appeal filed,* Case Nos. 7350, 7352, 7790.

## II. Fraud-on-the-Market Theory

Although the *Anderson* plaintiffs include several different claims in their action, respecting the plaintiff class certification issue the argument has focused on the § 10(b) and Rule 10b–5 aspects of the case. In addition to use of the mails or interstate commerce in connection with the purchase or sale of a security, plaintiffs must allege the following in order to state a claim under § 10(b) and Rule 10b–5:

The separate elements of a 10b–5 claim are well established: first, 'scienter of the defendant,' second, 'materiality of any misrepresentation or omission by the defendant,' third, 'the extent of actual reliance by the plaintiff on the defendant's statements,' and fourth, 'the justifiability of the reliance, frequently translated into a requirement, of due diligence by the plaintiff.' *White v. Sanders,* 689 F.2d 1366, 1367 (11th Cir.1982) *quoting Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). *See also e.g., Diamond v. Lamotte,* 709 F.2d 1419, 1422–23 (11th Cir.1983) (essential elements are false representation of material fact, defendant's scienter, plaintiff's justifiable reliance, and proximate causation of plaintiff's damages).

*Cavalier Carpets v. Caylor,* 746 F.2d 749, 753 n. 16 (11th Cir.1984). The subjective inquiry of whether a particular investor relied on the alleged misrepresentations renders Rule 10b–5 actions inappropriate for class action certification in many cases. *See* Black, *Fraud On The Market: A Criticism Of Dispensing With Reliance Requirements In Certain Open Market Transactions,* 62 N.C.L.Rev. 435, 437 (1984) [hereinafter Black]. Thus, in order for Rule 10b–5 claims to be appropriate for class action treatment, courts have had to deemphasize the subjective requirement of reliance.

The requirement for proving reliance under Rule 10b–5 varies depending upon whether the case primarily involves misrepresentations or omissions of material facts. In the traditional misrepresentation case, the plaintiff must establish that "the misrepresentation is a substantial factor in determining the course of conduct which results in [the investor's] loss." *List v. Fashion Park,* 340 F.2d 457, 462–63 (2nd cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). In cases primarily involving omissions or nondisclosures of material facts, the Supreme Court has relaxed the reliance requirement, allowing a rebuttable presumption of reliance in such cases where the defendant had a duty to disclose the material information withheld.

*Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

*Affiliated Ute* and other cases recognized that requiring a Rule 10b–5 plaintiff to prove actual reliance would in effect preclude recovery in certain contexts even though a causation-in-fact exists. These cases combined with other factors to allow the development of the fraud-on-the-market theory, which relaxes or eliminates the actual reliance requirement. Courts have applied the fraud on-the-market theory to various situations, resulting in difficulty in defining the theory. One commentator has defined cases applying a fraud-on-the-market theory simply as "a loosely defined group of decisions in which courts have allowed reliance on the integrity of the market to substitute for reliance on the defendant or the defendant's conduct." Note, *The Fraud-on-the-Market Theory,* 95 Harv.L.Rev. 1143, 1146 (1982) [hereinafter Harvard Note]. Two assumptions underlie the liability aspect of the fraud-on-the-market theory: (1) the efficient market hypothesis, which posits that in a free and actively traded market, stock prices reflect all available information about a corporation and, thus, a stock's price is the best estimate of the company's intrinsic value; and (2) the average investor does not need to read and review available information because he relies on the *integrity* of the market price in securities transactions, i.e. he relies on the premise that the market price is validly set. *See Levinson v. Basic, Inc.,* 786 F.2d 741, 750 (6th Cir.1986), *cert granted,* —— U.S. ——, 107 S.Ct. 1284, 94 L.Ed.2d 142 (1987); *HSL v. Daniels,* 1983 Fed.Sec.L.Rep. (CCH) ¶ 99,577 at 97,199 (N.D.Ill.1983) [available on WESTLAW, 1983 WL 1385]; Note, *The Fraud-on-the-Market Theory: Efficient Markets and the Defenses to an Implied Rule 10b–5 Action,* 70 Iowa L.Rev. 975, 978–80 (1985) [hereinafter Iowa Note]; Harvard Note at 1154.

Despite criticism of some of its applications, the fraud-on-the-market theory has been accepted in various forms by the Second, Fifth, Sixth, Ninth, Tenth and Eleventh Circuits, and district court decisions adopting the theory are too numerous to cite. *See, e.g., Levinson,* 786 F.2d at 750; *Lipton v. Documentation, Inc.,* 734 F.2d at 740, 747 (11th Cir.1984), *cert denied,* 469 U.S. 1132, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985). *T.J. Raney & Sons v. Fort Cobb, Oklahoma Irrigation Fuel Authority,* 717 F.2d 1330 (10th Cir.), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1983); *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir. 1981), *vacated as moot sub. nom., Price Waterhouse v. Panzirer,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *Shores v. Sklar,* 647 F.2d 462 (5th Cir. 1981), *cert. denied,* 459 U.S. 1102 (1983); *Blackie v. Barrack,* 524 F.2d 891 (9th Cir. 1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). The essential appeal of the fraud-on-the-market theory is understandable; for example, one court in applying the theory noted that "[i]t is an article of faith in federal securities law that the totality of the market responds to the measured judgment of buyers and sellers evaluating all public information relating to the security in which they are trading." *Schlanger v. Four-Phase Systems, Inc.,* 555 F.Supp. 535, 538 (S.D.N.Y.1982). As the court in *In Re LTV Securities Litigation,* 88 F.R.D. 134 (N.D.Tex.1980) persuasively explained the theory:

> The presumption can be considered recognition of the market's role as a transmission belt linking the misrepresentation and the individual purchaser or seller. ...
>
> In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus, the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

*Id.* at 143.

Courts and commentators have developed several versions of the fraud-on-the-

market theory, only one of which is pertinent to this case. In *Shores,* the Fifth Circuit was confronted with an alleged fraudulent scheme in connection with the original issuance of revenue bonds by a municipal industrial development board. The *Shores* plaintiff admitted that he had not seen the offering circular and was not aware of it, and that he bought the bonds on the recommendation of his broker. The gravamen of the *Shores* plaintiff's complaint was that the defendants were engaged in a fraudulent scheme "so pervasive that without it the issuer would not have issued, the dealer could not have dealt in, and the buyer could not have bought these Bonds, because they would not have been offered on the market at any price." 647 F.2d at 464 n. 2. The Fifth Circuit holding that such allegations stated a claim despite plaintiff's admitted non-reliance on the offering circular, stated:

> We hold the securities laws and regulations have a purpose broader than merely criticizing ever-lengthening, complex prospectuses. They cover deliberate, manipulative schemes to defraud which can annul not only the purpose of disclosure but also the market's honest function.

*Id.* at 464. The *Shores* court held that while the plaintiff's Rule 10b–5(2) claim could not survive his admitted lack of reliance on the offering circular, he could state a claim under Rule 10b–5(1) and/or (3) by alleging a broader, fraudulent scheme. *Id.* at 469. Under this theory, the reliance and causation-in-fact elements are established by showing that "the scheme was intended to and did bring the Bonds onto the market fraudulently and … [plaintiff] relied on the integrity of the offerings of the securities market." *Id.* The *Shores* court delineated the elements of a claim under this theory:

> (1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers, (2) [plaintiff] reasonably relied on the Bonds' availability on the market as an indication of their apparent genuineness, and (3) as a

result of the scheme to defraud, he suffered a loss. (footnote omitted).
*Id.* at 469–70.

The *Shores* version of the fraud-on-the-market theory has been viewed as restrictive because it does not allow a plaintiff a presumption of indirect reliance on documents in order to state a claim under Rule 10b–5(2) and because it allows recovery only for unmarketable securities and not for securities with distorted prices. *See Kennedy v. Nicastro,* 517 F.Supp. 1157 (N.D.Ill.1981); *Black,* at 453. However, most courts and commentators have recognized that the *Shores* version of the fraud-on-the-market theory is a distinct, expansive interpretation because it applies the theory to newly-issued securities in an undeveloped market. *See, e.g., Documation,* 734 F.2d at 746–48; *T.J. Raney,* 717 F.2d at 1333; *Black,* at 453–55; *Note, Rule 10b–5 Securities Fraud: Regulating the Application of the Fraud–On–the–Market Theory of Liability,* 18 J.Mar.L.Rev. 733, 736 n. 21, 745–48 (1985) [hereinafter John Marshall Note]; *Brunelle, The Shores Case— Expansion of the "Fraud on-the-Market" Doctrine,* 9 Sec.Reg.L.J. 390 (1982). Commentators have been critical of the *Shores* application of the fraud-on-the-market theory to newly issued securities traded on an undeveloped market. *See, e.g., John Marshall Note,* at 736 n. 21, 745–48; *Black,* at 472–73; *Harvard Note,* at 1156–58. Nevertheless, the *Shores* version of the theory has been accepted by a number of courts. *See, e.g., T.J. Raney,* 717 F.2d at 1332–33; *Goldwater v. Alston & Byrd,* 116 F.R.D. 342, Fed.Sec.L.Rep. (CCH) ¶ 93,304 (S.D.Ill. 1987); *Ross,* 1986 Fed.Sec.L.Rep. (CCH) ¶ 92,526; *Gibb v. Delta Drilling Co.,* 104 F.R.D. 59, 67–69 (N.D.Tx.1984) (pleading of *Shores* version insufficient); *Masri v. Wakefield,* 106 F.R.D. 322, 324–25 (D.Colo. 1984); *Greenwald v. Integrated Energy, Inc.,* 102 F.R.D. 65, 69–71 (S.D.Tx.1984); *see also Arthur Young & Co. v. United States District Court,* 549 F.2d 686 (9th Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977); *Shores v. Sklar,* 1986 Fed.Sec.L.Rep. (CCH) ¶ 92,874 (N.D. Ala.1986) (Shores II) [Available on WESTLAW, 1986 WL 9810]; *Black* at 453 n. 116.

*But see Vervaecke v. Chiles Heider & Co.,* 578 F.2d 713 (8th Cir.1978). This court is bound by the *Shores* decision. *Documation,* 734 F.2d at 743 n. 4.

■ Defendants, especially Bank South, argue that under the facts of this case there was no fraud on the market (*See* Doc. 111). The court recognizes that this case presents significant, and rather unusual facts which may render plaintiffs' fraud-on-the-market claim difficult to prove. However, plaintiffs' allegations of the fraud-on-the-market theory in this case are sufficient for class action purposes. *See Shores,* 647 F.2d at 469–70; *Delta Drilling,* 104 F.R.D. at 68–69; *Ross,* 1986 Fed. Sec.L.Rep. ¶ 92,526 at 93,155. As the court noted in *Sheftelman v. Jones,* 667 F.Supp. 859, 863 (N.D.Ga.1987), defendants are free to file summary judgment motions on the fraud-on-the-market claims. Finally, the Supreme Court has granted certiorari in *Levinson* on the issue of fraud-on, the-market. The Supreme Court may reject the fraud-on-the-market theory either *in toto* or as applied to particular circumstances, potentially depriving plaintiffs of their fraud-on-the-market claim.

### III. Class Action Analysis

#### 1. Numerosity

■ Plaintiffs must first establish that the proposed plaintiff class is so numerous that joinder is impracticable. In order to satisfy this requirement, plaintiff need not allege the exact number and identity of the class members, but must only establish that joinder is impracticable through "some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1038 (5th Cir.1981); *see, e.g., Sanders v. Robinson Humphrey/American Express, Inc.,* 634 F.Supp. 1048, 1055–56 (N.D.Ga.1986), *aff'd. in part, rev'd in part, Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718 (11th Cir.1987); *In re Data Access Systems Securities Litigation,* 103 F.R.D. 130, 137 (D.N.J.1984); *Biben v. Card,* 1986 Fed.Sec.L.Rep. (CCH) ¶ 92,462 at 92,825 (W.D.Mo.1986) [available on WESTLAW, 1986 WL 1199]; 1 H. Newberg, *Newberg on Class Actions,* ¶ 3.06 at 139 (2d ed. 1985) [hereinafter Newberg]. The evidence before the court indicates that there are well over 3,500 Bishops Glen Bondholders. Although the court recognizes that purchasers cannot be equated automatically with bondholders, who do not have a claim under 10b–5 as such, *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the court considers the number of bondholders sufficient to establish the numerosity of bond purchasers in the absence of evidence that a large number of the bondholders received their bonds by means other than purchase. *See e.g., Biben,* 1986 Fed.Sec.L.Rep. ¶ 92,462 at 92,825. *Contra Shores II* 1986 Fed.Sec.L.Rep. ¶ 92,874 at 94,251. Moreover, none of the defendants has contested the numerosity of the plaintiff class. Accordingly, the court finds that the Rule 23(a) (1) numerosity requirement has been satisfied by the plaintiff class. If the court determines that the plaintiff class should include subclasses, they may not be required to satisfy independently the numerosity factor. *See* Newberg § 3.09.

#### 2. Commonality

Although Rule 23(a)(2) requires that the case contain questions of law or fact common to the class, it does not mandate that all questions of law or fact be common. *Goldwater v. Alston & Bird,* 116 F.R.D. 342, Fed.Sec.L.Rep. ¶ 93,304. Rather, there must be "at least one issue whose resolution will affect all or a significant number of the putative class members." *Id.* at 347, at 96,524. Several common questions of law and fact are raised with respect to the plaintiff class, the most important of which at this juncture is whether or not there was a *Shores*-type scheme to defraud the investors. This question encompasses numerous common issues, including whether or not there were omissions and misstatements, defendants' liability for the formulation and dissemination of such misrepresentations, and whether the Bonds would have been issued and marketed if the true facts had been publicly

disclosed. Materiality also may well be an important common question, especially since the evidence at this time seems to indicate that the Bishops Glen Bond market reacted sluggishly, if at all, to the news of the Royal Regency default. However, the court recognizes that the failure of the market to react to the Royal Regency default may be attributable not simply to lack of materiality but instead to the underdeveloped nature of the market or to the partial nature of the disclosure of the fraud.

3. Typicality

The typicality requirement is met "if the claims of the named plaintiffs have the same essential characteristics as the class at large." *Sheftelman,* 667 F.Supp. at 863. Defendants have raised numerous issues in connection with the typicality requirements. Several of the issues currently are before the Eleventh Circuit, in the *Ross* and *Sanders* appeals, and it cannot be overemphasized that the decisions in these cases may require reassessment of these issues.

The unusually slow sale of Bishops Glen Bonds presents significant typicality and commonality problems which the court will address under typicality. In part, the difficulty in determining these issues is a consequence of the problems created by applying fraud-on-the-market concepts in an underdeveloped market. For example, in an undeveloped market setting, the court cannot assume that the price or even the purchasing decisions are premised upon all of the available information. Thus, the fact that information about Royal Regency marketing problems was available in early Fall, 1983 articles is not necessarily reflected in the price of the Bonds. More importantly, the *Shores* theory focuses on the fraudulent marketing of the Bonds rather than an inflated price, and, arguably, the price is irrelevant as long as fraudulent marketing continued.

a. Variable Market Information

The problem of variable information in the market usually does not preclude certi-

fication when the dissemination of information is considered part of the course of conduct in furtherance of the securities fraud. *See, e.g., Kennedy,* 710 F.2d at 716–17; *Green v. Wolf Corp.,* 406 F.2d 291 (2d Cir.1968); *In re Storage Technology,* 113 F.R.D. 113, 115 (D.Colo.1986); *In re Lilco Securities Litigation,* 111 F.R.D. 663, 668–69 (E.D.N.Y.1986); *Shamberg v. Ahlstrom,* 111 F.R.D. 689, 697 (D.N.J. 1986); *Stoller,* 1985 Fed.Sec.L.Rep. ¶ 92,298 at 92,023–24, 92,029–30; *see also Michaels v. Ambassador Group, Inc.,* 110 F.R.D. 84, 87–88 (E.D.N.Y.1986); *But see Zandman v. Joseph,* 102 F.R.D. 924, 928–29 (N.D.Ind.1984); *Fickinger v. C.I. Planning Corp.,* 103 F.R.D. 529, 534 (E.D.Pa. 1984). This "common course of conduct" treatment is especially appropriate in fraud-on-the-market cases since this theory "directs attention not to the specific effect of each public statement but rather on the cumulative effect of all the documents and representations on the investing public's decision to purchase a particular security." *Biben,* 1986 Fed.Sec.L.Rep. ¶ 92,462 at 92,831. However, this case is distinguishable from the "common course of conduct" cases because the variable information relates to disclosure of the true facts rather than to dissemination of information in furtherance of the alleged scheme.

Defendants argue that claims after the September 29, 1983 offering date are not typical and that any class period should end either on that date, or on the date of the Royal Regency release, or when Bank South declared the Royal Regency bonds in default. Liability under the securities acts terminates and the class period should be cut off "when curative information is publicly announced or otherwise effectively disseminated." *In re Data Access,* 103 F.R.D. at 144; *Healy v. Loeb Rhoades & Co.,* 99 F.R.D. 540, 542–43 (N.D.Ill.1983). Some courts have refused to limit the class period where the determination of when to terminate the class requires an examination of the merits of the case. *In re Activision Securities Litigation,* 621 F.Supp. 415, 432–33 (N.D.Cal.1985); *In re Victor Technologies Securities Litigation,* 102 F.R.D. 53, 58 (N.D.Cal.1984), *aff'd,* 792

F.2d 862 (9th Cir.1986); *Grossman v. Waste Management, Inc.,* 100 F.R.D. 781, 788 n. 6 (N.D.Ill.1984).

Negative information available in the market does not necessarily preclude claims or render them atypical. *See In re Consumers Power Co. Securities Litigation,* 105 F.R.D. 583, 608 (E.D.Mich.1985); *Mottoros v. Abrams,* 524 F.Supp. 254, 260 (W.D.Ill.1981). The effect of such disclosures may be viewed as a fact question to be determined at trial. *Mottoros,* 524 F.Supp. at 260. Even though the alleged misrepresentations were cured at least in part by the November Royal Regency release, which indicated that marketing efforts were substantially below projections and that reorganization proceedings were under consideration, and by the December declaration by Bank South that the bonds were in default, the price of the Bishops Glen Bonds did not respond appreciably to these events. The failure of the price of Bishops Glen Bonds to react to this information may be attributable to any of several factors, including the possibility that the alleged misrepresentations were not cured or were only partially cured by this information. *See In re American International, Inc. Securities Litigation,* 108 F.R.D. 190, 192–93 (S.D.N.Y.1985). Alternatively, the failure to respond may be a function of the undeveloped nature of the market, or it may indicate that the alleged misrepresentations concerning Royal Regency were not material. Accordingly, the court is unwilling to conclude that claims arising from post-September 29, 1983 purchases are atypical and deems it inappropriate to terminate the class period in November or December, 1983. However, the court believes that subclasses may be appropriate to aid the court and the parties in managing this litigation.

b. Reliance

■ The fact that some of the proposed class representatives read and relied on the OS while others did not does not preclude class certification. Some named plaintiffs may have claims based only on the fraud-on-the-market theory, while other named plaintiffs also may have claims based on their reliance on the OS. In *Kennedy,* 710 F.2d at 717, the Eleventh Circuit indicated that the fraud-on-the-market claim by the named plaintiff, who did not read or rely on the prospectus, was not atypical even though other class members read and relied on the statement. *See Sheftelman,* 667 F.Supp. at 864–65. Similarly, partial reliance by a named plaintiff on a prospectus does not preclude class certification. *Id.; Gavron v. Blinder Robinson Co., Inc.,* 115 F.R.D. 318, 323 (E.D.Pa.1987); *see Rifkin v. Crow,* 574 F.2d 256, 259–60 (5th Cir.1978). *But see Shores II,* 1986 Fed.Sec. L.Rep. ¶ 92,874 at 94,251 (stating that the Fifth Circuit in *Shores I* narrowed the putative class to those purchasers who did not rely on the offering circular).

Defendants also argue that the named plaintiffs are subject to unique, nonreliance-related defenses which show that they did not rely on the integrity of the market and which render their claims atypical. Specifically, defendants argue that Anderson, McCarthy, Heald and Keogh relied instead on oral representations by their brokers. Although pure causation fraud-on-the-market theorists disagree, *see* Iowa Note at 987–88, courts have recognized a defense of nonreliance on the market. In *Grossman,* the court discussed this defense at length, stating:

As we have noted, in a fraud on the market case, proof that the plaintiff relied on factors extraneous to the market may serve to rebut the presumption of reliance; if defendants can show that this defense is arguably applicable to plaintiffs and inapplicable to the remainder of the class, plaintiffs' claims are not typical under *Koos. See, e.g., Markewich v. Ersek,* 98 F.R.D. 9, 10–11 (S.D.N.Y.1982) (reliance on recommendation of broker who had "inside" information); *McNichols,* 97 F.R.D. at 340, [Current] Fed.Sec.L.Rep. (CCH) at 96,645–49 (reliance on misrepresentations by one allegedly part of scheme to defraud); *Beissinger v. Rockwood Computer Corp.,* 529 F.Supp. 770, 786–87 (E.D.Pa.1981) (reliance upon recommendation of a comptroller of a client of plaintiff's ac-

counting firm); *Kline v. Wolf,* 88 F.R.D. 696, 699–700 (S.D.N.Y.1981) (one plaintiff who relied solely on husband's recommendation and another who was a speculative trader); *Greenspan v. Brassler,* 78 F.R.D. 130, 132–33 (S.D.N.Y.1978) (purchase based on recommendation of plaintiffs' brother, a professional investor who based recommendation on generalized faith in the type of investment in question). However, if plaintiff relied on statements of third parties that merely reiterated, digested, or reflected the misstated information that forms the basis of the securities fraud claims, plaintiff has not relied on "factors wholly extraneous to the market." See *Sargent v. Genesco, Inc.,* 75 F.R.D. 79, 85 (M.D.Fla. 1977).

100 F.R.D. at 788; *see Glick v. E.F. Hutton & Co.,* 106 F.R.D. 446 (E.D.Pa.1985) (named plaintiff's claim atypical where it was premised substantially on oral representations based on inside information); *Zandman,* 102 F.R.D. at 930–32 (reliance upon personal contacts with company officials); *Schlanger v. Four–Phase Systems, Inc.,* 555 F.Supp. at 538 (partial reliance on a misleading statement does not preclude certification). A review of the depositions of Anderson, McCarthy, Heald, and Keogh shows that the brokers' statements were general, informational comments such as the rate of interest and tax-exempt status of the Bonds. Nothing in these depositions demonstrates that plaintiffs did not rely on the integrity of the market, nor do the depositions show that any of these plaintiffs relied on factors wholly extraneous to the market.

■ In contrast, plaintiff Hamel, who had experience in real estate investment, conducted a personal investigation before investing in the Bishops Glen Bonds. His investigation before his initial purchase included a visit to the facility site, discussions with Bishop, whom he thought was the developer, and a review of the OS. Hamel also was aware that Florida recently had passed a 50% pre-sale requirement designed to insure that similar projects were viable, but he purchased the bonds even though he knew the Bishops Glen Project was only 20% pre-sold. Before his second purchase, Hamel visited the site on a monthly basis, checked on the sales progress several times, and discussed the marketing effort and lagging sales with Bishop. Because of this extensive personal investigation, including discussions with an insider whom Hamel believed was the developer, the court concludes that defendants have made a sufficiently substantial showing that Hamel did not rely on the integrity of the market and, consequently, that his claims are atypical.

### c. Other Unique Defenses

Defendants also argue, without citation of authority, that Hamel, Heald, and McCarthy are subject to a unique defense because they jointly purchased bonds with family members who are not parties. Defendants contend that these named plaintiffs are subject to an indispensable party defense because of non-party spouses and children. The court finds this argument unconvincing as an argument against class certification since if a plaintiff class is certified, the absent joint purchasers will be unnamed members of the class. Defendants claim that the fact that Anderson purchased before the September 29, 1983 OS was published precludes his claim. However, the preliminary OS and other information was available, and the bonds were being sold. Since plaintiffs are proceeding on a fraud-on-the-market theory and alleging a fraudulent scheme to market the bonds, Anderson's early purchase and nonreliance on the final OS should not preclude his claim. For the reasons discussed above, the court believes that all of the named plaintiffs except Hamel have typical claims. However, it appears necessary to create subclasses in order to distinguish between those who purchased before and after the Royal Regency default.

### 4. Adequacy of Representation

Defendants raise only two significant issues in connection with the adequacy of representation by the named plaintiffs and their counsel. Defendants claim that there are conflicts of interest among the putative

class members because they purchased at different times. The cases cited in Section III. 3(a) of this opinion have rejected similar arguments.

■ Defendants also argue that class members have conflicts of interest based upon the contention of potential class members in other actions that the Bishops Glen Bonds were not tax exempt. *See Hamberg v. J.B. Development, Ltd.*, Case No. 86–490–CIV–ORL (M.D.Fla.1986); Plaintiffs in this action maintain that the bonds were tax-exempt, and, consequently, their theory of recovery would not result in adverse tax consequences for other class members or bondholders. *Cf. Dannenburg v. Dorison*, 603 F.Supp. 1238, 1243–44 (S.D.N.Y.1985). However, a situation might arise whereby two classes, one in *Hamberg* and the instant one, would be certified. The legality of certifying two separate classes might be questioned. Furthermore, if the classes were combined, the question of tax exemption would be a divisive issue. Plaintiffs in *Hamberg* contend the Bonds are not tax exempt, thereby rendering Hamberg and others in *Hamberg* inappropriate class representatives of the instant class members, who maintain the Bonds were tax exempt. However, the tax exemption issue is significant only with regards to the fraud-on-the-market theory. A Supreme Court ruling in *Levinson* might eliminate the fraud-on-the-market theory altogether. Absent a fraud-on-the-market claim and the attendant tax exemption issue, Hamberg might be an appropriate class representative. At present, however, the Court will not address this rather remote scenario. It is sufficient that those class members who wish to challenge the tax deductibility of the bonds may opt out of the plaintiff class. Accordingly, the court does not believe that the tax issue presents a conflict in this case.

With respect to the adequacy of counsel, counsel for the putative class is experienced in complex securities fraud litigation. Mr. Chimicles, plaintiffs' lead counsel, has represented the interests of bondholders of other life care facility projects. Local counsel for the plaintiffs also is experienced in securities class action litigation as well as general, complex commercial litigation. The court is convinced that these attorneys possess the requisite skill, ability and experience to represent a plaintiff class in this action.

■ Defendants contend, however, that plaintiffs' counsel has a conflict of interest precluding class certification because Greenfield & Chimicles represent competing classes against common named defendants in at least four other class or proposed class actions. The principal conflict involves common defendants in *Sheftelman*, which recently was certified as a class action. Common defendants in these two actions include HOJ, Swink, Finerock, and Arnall Golden & Gregory. HOJ is unable to satisfy competing judgments, and defendants contend that Swink also would be unable to satisfy judgments in both this action and *Sheftelman*. This court, like that in *Sheftelman*, is concerned about the potential conflict, but similarly concludes that it does not render plaintiffs' counsel inadequate. The conflict is speculative, since plaintiffs must obtain judgments in both cases and defendants must be unable to satisfy the judgments before an actual conflict arises. The court is unable to evaluate the *Sheftelman* case, but plaintiffs' fraud-on-the-market theory may be difficult to prove in this case because of an unusually lengthy selling period and a non-responsive market. Moreover, procedural safeguards protect the proposed class to some extent. Local counsel for plaintiffs are not involved in the *Sheftelman* case, and the court will expect them to be independently vigilant on behalf of the plaintiff class. In addition, the court must approve any proposed settlement, thus safeguarding the class interest. Finally, the potential conflict shall be disclosed to the class members in the notice. *See Sheftelman*, 667 F.Supp. 859; *Ross* 1986 Fed.Sec.L.Rep. ¶ 92,526 at 93,150.

5. Predominance

In a class action under Rule 23(b)(3), common questions must predominate over any questions affecting only individual

members. Defendants' arguments that common questions do not predominate focus on the nonreliance and variable information arguments discussed above. However, the court finds that the common questions predominate.

■ The predominance determination involves an analysis of the substantive elements of plaintiffs' claims and the requisite proof on these issues and an inquiry into the form the trial on the issues would take. *See Simer v. Rios*, 661 F.2d 655, 672–73 (7th Cir.1981), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982); *Goldwater*, Fed.Sec.L.Rep. ¶ 93,304 at 96,-529. The elements of plaintiffs' claims are the elements previously discussed at length. Proof of the fraudulent scheme is the focal point of this case. As one court observed, "[p]roving the alleged fraud on the market is an enormous task, overshadowing individual questions." *Healy*, 99 F.R.D. at 542. The existence of a fraudulent scheme, with its component issues including defendants' misrepresentations, intent and materiality, must be established before nonreliance issues are reached. *Goldwater*, Fed.Sec.L.Rep. ¶ 93,304 at 96,-529 n. 49. If a jury makes an affirmative finding of a fraudulent scheme, issues concerning variable market information and other nonreliance questions as well as statute of limitations questions may be referred to magistrates or to a special master. *Id.* Difficulties caused by variable market information should be obviated substantially by the creation of subclasses. Since there is no evidence in the record that Royal Regency bondholders were better informed about the project's problems than were the other bondholders and the rest of the bond market, subclassing also should eliminate potential individual questions raised by the fact that some Bishops Glen Bondholders also held Royal Regency bonds.

6. Superiority

■ Rule 23(b)(3) also requires that class action treatment be superior to other available methods for adjudication of the controversy. Generally, securities fraud actions

are considered especially appropriate for class action treatment because they often involve a large number of plaintiffs with relatively small claims. *See, e.g., Sheftelman*, 667 F.Supp. 868. For the most part, in light of their relatively small investments, class members are unlikely to desire to control and prosecute a complex securities action. Although any class action is difficult to manage, it appears more desirable than multiplicious lawsuits stemming from the $34 million dollar Bond offering. Given the fact that approximately half of the bondholders reside in Florida, and both the Bishops Glen project and the Royal Regency project are located in this district, concentration of the litigation in this forum is appropriate.

For the reasons discussed above, the court at this time believes that this action eventually should be certified as a class action, with subclasses defined in connection with purchases before or after the Royal Regency default. It is important to bear in mind, however, that the Supreme Court has granted certiorari in *Levinson*, the outcome of which may substantially affect the viability of the fraud-on-the-market theory. Finally, the decisions of the Eleventh Circuit in *Ross* and *Sanders* may require a different analysis of several issues and ultimately may necessitate a different conclusion on the class certification issue.

Accordingly, at the present time, the Court defers determination of the class certification issue until the Eleventh Circuit decides *Ross* and *Sanders* and resolves issues pertinent to the instant case.